

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-2006

# USA v. Salehi

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3417

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Salehi" (2006). *2006 Decisions.* Paper 829.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/829

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 03-3417, 03-3418, 03-3419, 03-3916, 03-3430

———

UNITED STATES OF AMERICA

v.

SHER MOHAMMAD SALEHI a/k/a HAJI LATIF,
Appellant in Nos. 03-3417 & 03-3419
ABDUL QAHER SAMPSON, Appellant in No. 03-3418
OBAIDULLAH AZZIZI a/k/a ABADALLAH AZZIZI a/k/a ABAD ABDUL,
Appellant in No. 03-3916, and
QUINTON YATES a/k/a QUADREE a/k/a DREE a/k/a BIG BRO, Appellant in 03-3430

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Crim Nos. 01-cr-00401-10, 01-cr-00674-1, 01-cr-00674-2,
01-cr-00674-3 and 01-cr-00401-1)
District Judge: Honorable Katharine S. Hayden

———

Argued January 31, 2006

———

Before:  McKEE, VAN ANTWERPEN, and SILER, Circuit Judges.*

(Filed June 28, 2006)

_____

  *  The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth
Circuit Court of Appeals, sitting by designation.

Timothy M. Donohue, Esq. (Argued)

Arleo & Donohue
622 Eagle Rock Avenue
West Orange, NJ 07052
    *Attorney for Appellant Sher Mohammad Salehi* in Nos. 03-3417 and 03-3419

Alan Dexter Bowman, Esq. (Argued)
Gateway I, Suite 105
Newark, NJ 07102
    *Attorney for Appellant Abdul Qaher Sampson* in No. 03-3418

Jean D. Barrett, Esq. (Argued)
Ruhnke & Barrett
47 Park Street
Montclair, NJ 07042
    *Attorney for Appellant Obaidullah Azzizi* in No. 03-3916

Joseph R. Donahue, Esq. (Argued)
Brickfield & Donahue
70 Grand Avenue
River Edge, NJ 07661
    *Attorney for Appellant Quinton Yates* in No. 03-3430

Christopher J. Christie, United States Attorney
George S Leone, Chief, Appeals Division
Sabrina G. Comizzoli, Assistant United States Attorney (Argued)
Office of the United States Attorney
970 Broad Street
Newark, NJ 07102-2535

Glenn J. Moramarco, Assistant United States Attorney
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101
    *Attorneys for Appellee*

____

VAN ANTWERPEN, <u>Circuit Judge</u>.

Sher Mohammad Salehi, Obaidullah Azzizi, Abdul Qaher Sampson, and Quinton Yates appeal from their convictions and sentences in these consolidated appeals.[1] Salehi, Azzizi, and Sampson were charged in a September 16, 2002, Superseding Indictment with conspiracy to distribute and possession with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846 (Count One). They were also charged with a substantive count of distributing 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) (Count Two). Both counts related to a 250-gram heroin transaction the three allegedly orchestrated in early 2001. Yates, meanwhile, pleaded guilty to two counts in a separate Superseding Indictment charging him with one count of conspiracy to distribute and possession with intent to distribute more than one kilogram of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(a), & (b)(1)(C), as well as one count of possession with intent to distribute a quantity of heroin on or about June 21, 2001 in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C), and 18 U.S.C. § 2.

We have jurisdiction over these appeals pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We will affirm the convictions and vacate the sentences of all but Azzizi, remanding them for re-sentencing in accordance with *United States v. Booker*, 543 U.S.

_____

[1] Yates appeals only his sentence. Counsel for Azzizi informed us at argument that Azzizi has already been re-sentenced, thus rendering his appeal of his sentence moot.

220 (2005) and our decision in *United States v. Davis*, 407 F.3d 162 (3d Cir. 2005).

## I.

We turn first to a summary of the evidence underlying the convictions of Salehi, Azzizi, and Sampson. Trial testimony and audio recordings of telephone conversations established a transaction involving the sale, on credit, of some 250 grams of heroin in early 2001 from Azzizi to Salehi to Sampson; and, also, three later separate heroin transactions between Sampson and government witness Nadar Khan. Khan testified to firsthand knowledge not only of these latter transactions, but also of attempts by Salehi, Azzizi, and Sampson to work out a problem that later arose among the three with respect to the 250-gram transaction when Sampson's buyer was arrested on another matter before he paid Sampson for the drugs.

Evidence proffered by the government established that Salehi, Azzizi, and Sampson had all known each other for a long period of time, through their families; that their long-standing relationships, among other things, gave rise to a decision by the three to arrange the 250-gram heroin deal in early 2001; that Azzizi provided the heroin to Salehi on credit, who in turn provided the heroin to Sampson on credit; and that, as mentioned, the three then communicated together at length to solve a problem that subsequently arose when Sampson's purchaser took possession of the heroin but was arrested on another matter before paying for it. The government maintained that audio recordings of these conversations suggested a unity of purpose, an intent to achieve common goals. Some recorded conversations showed Salehi and Azzizi referring to

4

themselves as "we" and discussing debts they jointly owed; in these conversations they not only briefed each other on current matters, but proposed future deals and joint plans.[2] As is often the case, neither heroin nor other generic words for drugs were expressly mentioned in these calls. In another recording on March 30, 2001 (which relates to an issue under *Bruton v. United States*, 391 U.S. 123 (1968), as we discuss below), Salehi and Azzizi speak with Sampson during a three-way call after first speaking among themselves. Sampson, upon learning that Azzizi is on the phone, asks questions showing his familiarity with Azzizi, and then participates in a conversation that appears amicable, even businesslike, as the three attempt to resolve two problems relating to an unidentified item Sampson received from Salehi: Salehi's contention that he was not paid, and Sampson's contention that some of the unidentified item was "bad."[3] The government

---

[2]  In addition to their repeated use of the pronoun "we," Azzizi states to Salehi in one recording: "[i]f you want, I can send it . . . . I want to make this deal"; Salehi then appears to give his consent. Salehi later articulates his level of trust in, and his level of closeness to, Azzizi: "You're my dear friend. I always trust you, but I'm worried about your drinking habit." Both Azzizi and Salehi initiated talk of joint plans. Azzizi states at one point: "We will make some future plans . . . . So[,] we should work on some plan." Salehi, in turn, states, "Wait some days, we can work on that plan. We can work on that plan."

[3]  In this three-way call, Sampson first asks of Azzizi, "[h]i, how are you, brother? How's everything?" He then evidences knowledge of Azzizi's present location: "[H]ave you come back, or are you still there [in Karachi]?" After concluding pleasantries, the three negotiate what the recording identifies as a debt owed for an unspecified item. Salehi states that "[h]e [Sampson] gave me one thirty and one twenty was left with him." Sampson replies: "You gave me that to compensate for my losses . . . . You gave the one hundred and twenty to compensate for my losses, because you had given me bad stuff." Salehi responds: "Listen, why didn't you give it back to me?" Sampson replies: "[Y]ou didn't want to reconcile the accounts . . . . " Salehi responds: "Brother, accounts should be reconciled even if they're fifty years old. You should see for how long [Azzizi] and I

5

contended this call and at least one in-person meeting was evidence of a conspiracy, rather than a chain of buyer-seller relationships, because Azzizi spoke with and had dealings with Sampson directly, rather than looking exclusively to Salehi for payment. Consistent with this recorded conversation, Khan testified that Azzizi, Salehi, and Sampson spent several months meeting in person and talking by phone in an attempt to satisfy the interests of all three men, because Salehi had received the heroin on credit from Azzizi and Sampson had received the heroin on credit from Salehi.

Appellants point out that neither Azzizi, Salehi, nor Sampson ever expressly mentions heroin or any similar generic word for drugs in the March 30, 2001 three-way conversation recorded by the government. Appellants thus contend, as we discuss in greater detail below, that this conversation proves nothing absent the testimony of government agent Martinez, who related the substance of Sampson's subsequent post-arrest inculpatory statement, in which Sampson says he participated in a three-way telephone call in March, 2001, concerning a 250-gram heroin transaction. As discussed below, Appellants argue that this evidence — as between Sampson's statement of what a three-way call in March had concerned, on the one hand, and the transcript of a March 30, 2001 three-way call, which was independently admissible, but which makes no express reference to drugs, on the other — violated their Confrontation Clause rights. They also argue, more generally, that the evidence at trial established only buyer-seller relationships, not the charged conspiracy. We address these and other arguments below, observing for now only that it is undisputed that the government's recorded three-way

_____

have maintained our accounts."

6

telephone conversation of March 30, 2001, while independently admissible, contained no express mention of heroin or drugs.

Independent of the above, the evidence also established that Sampson entered into a separate series of drug transactions with Khan starting sometime in late 2000. Sampson told Khan he had potential customers for Khan's heroin, Khan provided a sample, and then Sampson, on behalf of his customers, sequentially asked for amounts of 50, 50, and then 100 grams of heroin. Each time, Khan let Sampson buy drugs on credit. The evidence also established that on one occasion Sampson brought Khan with him to visit a customer. On that occasion, Khan elected to warn Sampson when he, Khan, thought he had identified an undercover police officer in the area who posed a risk to Sampson.

## II.

All told, Appellants raise almost twenty issues on appeal. We will first address the District Court's denial of the pre-trial severance motions of Appellants Salehi, Azzizi, and Sampson; last, we will address the judgments of sentence of Salehi, Sampson, and Yates, all of which were awaiting direct review when the Supreme Court handed down its decision in *Booker*.

### A. Appellants' Severance Motions

Salehi, Sampson, and Azzizi each contend they were prejudiced when the District Court denied their pre-trial motions to sever. Sampson and Azzizi each claim prejudice from evidence of Salehi's prior drug dealing activities admitted against Salehi; Salehi and Azzizi each claim prejudice from Sampson's post-arrest inculpatory statement which was admitted for use against Sampson.

7

We review for abuse of discretion, *United States v. Hart*, 273 F.3d 363, 369 (3d Cir. 2001), under which Appellants face "a heavy burden." *United States v. Console*, 13 F.3d 641, 655 (3d Cir. 1993). "The trial judge is in the best position to balance the possible prejudice to a defendant of a joint trial against the concerns of judicial economy. Therefore, an appellant must meet a particularly heavy burden to show that the trial court abused its discretion in denying a motion to sever." *United States v. Sebetich*, 776 F.2d 412, 427 (3d Cir. 1985) (citations omitted), *cert. denied*, 484 U.S. 1017 (1988); *accord United States v. Niederberger*, 580 F.2d 63, 66 (3d Cir. 1978) ("a severance motion will not be disturbed in the absence of a clear showing of an abuse of discretion"), *cert. denied*, 439 U.S. 980 (1978). To obtain a reversal, an appellant "must demonstrate '*clear and substantial prejudice* resulting in a *manifestly unfair trial*.' " *Console*, 13 F.3d at 655 (quoting *United States v. Sandini*, 888 F.2d 300, 307 (3d Cir. 1989)) (emphasis in *Sandini*).

Appellants do not prevail under this standard. The District Court removed potential prejudice with appropriate limiting instructions that assisted the jury in properly compartmentalizing the evidence. *See Console*, 13 F.3d at 655. More fundamentally, no Appellant has met his burden of demonstrating "clear and substantial" prejudice rising to the level of a "manifestly unfair" trial. *Id.* Accordingly, this ground has no merit.

B.  Sher Mohammad Salehi

Appellant Salehi contends the District Court erred in admitting testimonial evidence referencing the events of September 11, 2001. We review evidentiary rulings for abuse of discretion. *United States v. Vega*, 285 F.3d 256, 262 (3d Cir. 2002). Here,

8

cooperating government witness Khan testified that while he and Salehi were in pre-trial detention, Salehi told Khan they should go to trial, and not plead guilty, because he thought the drug evidence against them was all destroyed in the World Trade Center on September 11, 2001.

This testimony had probative value, as it helped establish the level of the relationship between Khan and Salehi. Fed.R.Evid. 401. This, in turn, helped explain how Khan knew of and could testify to Salehi's activities. It was also probative of Salehi's consciousness of guilt. *Id.* At the same time, the probative value of the statement was not substantially outweighed by any prejudicial effect. Fed.R.Evid. 403. The mention of the World Trade Centers and September 11th was not inflammatory, and there was, for instance, no link to Salehi's religion, ethnicity, or national origin. Rather, the record shows only Khan explaining why Salehi thought the drug evidence against them was gone.[4] This ground also lacks merit.

Salehi next contends the District Court erred in finding that his wife voluntarily consented to a search of their home subsequent to his arrest. Because it is a finding of fact, we review the District Court's determination of consent for clear error. *United States v. Kim*, 27 F.3d 947, 954-55 (3d Cir. 1994). Whether a person has voluntarily consented is evaluated under a totality of the circumstances test. *Schneckloth v.*

---

[4] The record belies Salehi's claim that Khan's testimony shows Salehi to have gloated over or otherwise celebrated the events of September 11th. Instead, the record shows the District Court took utmost care to exclude from Khan's testimony all potentially inflammatory language, such as Khan's proffered statement that Salehi sought to traffic heroin in the United States as part of a "jihad" or "holy war" against the United States for its involvement in Afghanistan.

*Bustamonte*, 412 U.S. 218 (1973). The burden is on the government to establish valid consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983).

Were we to independently review the evidence and credit Mrs. Salehi's testimony, we might be more sympathetic to this claim. We do not, of course, view the evidence through the prism of independent review. Under the clear error standard, reversal is permitted only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). We cannot say that here. Because the District Court's finding is "plausible in light of the record viewed in its entirety," we accept it. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). We therefore find no merit to this ground.

Next, Salehi contends his rights under the Confrontation Clause were violated when the District Court admitted, as against Sampson, a post-arrest inculpatory statement that Sampson made.[5] As foreshadowed above in our review of the facts, the introduction of this statement gives rise to a *Bruton* issue in this appeal. In the post-arrest statement, Sampson acknowledged that he participated in a three-way telephone conference call with Salehi and Azzizi in March of 2001, and expressly stated the call concerned a 250-gram heroin transaction earlier in 2001. It is possible to infer that the three-way March call about heroin that Sampson mentioned was the March 30, 2001 three-way conversation of Azzizi, Salehi, and Sampson and that this call involved a 250-gram heroin transaction. The government had independently recorded the three-way conversation between Azzizi, Salehi, and Sampson on March 30, 2001, and there is no dispute that the recording of that

---

[5]  Azzizi asserts this claim as well. *See infra*.

call, its transcript, and the identities of the participants were independently admissible. While, as discussed later, in the context of the entire case, a jury could have inferred that this call involved drugs, Sampson's statement could also imply that this particular call concerned heroin.

Importantly, the government did not introduce Sampson's post-arrest statement itself. Rather, the substance of Sampson's statement was introduced through the testimony of government agent Martinez. Agent Martinez's testimony did not contain any direct reference to the other defendants, nor redactions or identities in any form. In pertinent part, Sampson's post-arrest statement was introduced into evidence as follows:

> Q: After his arrest, did defendant Sampson make any statements in your presence?
> A: He did.
> Q: Did he tell you that he had been a participant in a three-way telephone conversation in March of 2001 regarding heroin transactions?
> A: He did.
> Q: Specifically, did he tell you that the transaction, the heroin transactions they were talking about, occurred in early 2001 and involved 250 grams of heroin . . . ?
> A: Yes.
> Q: And did defendant Sampson further state . . . [that he] merely introduced someone else to an individual Sampson knew as Dreadlock, and that those individuals engaged in the transaction?
> A: Yes.

The Court gave an instruction to the jury expressly limiting the applicability of this testimony to Sampson alone. Notwithstanding this limiting instruction, Salehi (and Azzizi, as discussed below) both argue that the introduction of Sampson's statement through the Agent violated *Bruton* and its progeny, and argue further that the prosecutor improperly used Sampson's statement on rebuttal during closing arguments.

11

We exercise plenary review over Confrontation Clause challenges. *United States v. Trala*, 386 F.3d 536, 543 (3d Cir. 2004). We review the District Court's denial of a mistrial motion based on the government's argument on summation for abuse of discretion. *United States v. Retos*, 25 F.3d 1220, 1228 n.10 (3d. Cir. 1994).

In *Bruton,* the Supreme Court held that the admission of a co-defendant's confession at a joint trial violates the non-declarant's right to confrontation if the confession implicates him. *Id.* at 126. Redaction can cure the constitutional problem that arises in such instances, but the redaction should not merely substitute a symbol or neutral phrase for the non-declarant co-defendant's name. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Similarly, substitutions of blank spaces or the word "delete" for non-declarant co-defendant's name(s) are also insufficient. *Gray v. Maryland*, 523 U.S. 185 (1998). In all such scenarios, the Supreme Court has rejected such substitutions because even though references have been nominally removed, a juror "need only to lift his eyes" to determine to whom the nominally redacted statement refers. *Id.* at 193. Based on these cases and their rationale, this Court has found that redactions employing the phrases "inside man" and "my friend" violated *Bruton* and *Gray* where there were only three participants in the charged crime. *United States v. Richards*, 241 F.3d 335, 341 (3d Cir. 2001). For the following reasons, we conclude that the line articulated by *Bruton* and its progeny was not crossed here.

Under the redaction scenarios contemplated by *Bruton* and its progeny, the facts presented in this appeal are somewhat different. First, Sampson's statement was not itself introduced into evidence; rather, agent Martinez testified as to the substance of what

12

Sampson said in agent Martinez's presence. As such, the government offered its evidence without use of redactions — be they symbols, blanks, the word "delete," or neutral phrases like "inside man" or "my friend" previously found to constitute *Bruton* violations. Second, undisputedly, the government already had on tape, and had already identified through Khan, the participation of Azzizi, Salehi, and Sampson in a three-way telephone conversation on March 30, 2001. There is no dispute that the recording, the identifications of the participants, and the transcript were independently admissible.

Thus the evidentiary link objected to by Salehi (as well as Azzizi, see below), was one not of redacted names or identities, but one arising by implication from the juxtaposition of the March 30, 2001 transcript against Agent Martinez's testimony about Sampson's post-arrest inculpatory statement regarding a three-way March call concerning heroin.

Nor is there any dispute that, at the request of several Appellants, the District Court issued a proper limiting instruction stating Sampson's statement could only used against him, and not against Salehi (or Azzizi). Under these facts, this was sufficient to limit the evidence and comply with *Bruton. See, e.g., Priester v. Vaughn*, 382 F.3d 394, 400-01 (3d Cir. 2004) (concluding district court did not err in holding admission of redacted statement proper under Sixth Amendment where district court gave appropriate limiting instructions and where no words, phrases, or place makers "unequivocally pointed to" defendant and were "bereft of any innuendo [tying] them unavoidably to" defendant).

In *Priester*, the redactions at issue were words such as "the other guy," "someone,"

"someone else," "the guy," and "another guy." 382 F.3d at 399. Priester argued that other evidence introduced against him made his identity clear to the jury, notwithstanding the redactions, because the jury could easily link the redactions to that other evidence. *Id.* We rejected Priester's contention, observing that, in *Richardson*, the Supreme Court rejected such a contextual implication argument. *See Richardson*, 481 U.S. at 208 (stating that where ascertaining the identity of a co-defendant in a statement requires an inference drawn from linking other evidence to the statement, the risk that the jury cannot follow limiting instructions is not sufficiently substantial to violate the Sixth Amendment); *Priester*, 382 F.3d at 400.

Ultimately, we need not reach this issue. If we were to assume that the introduction of Sampson's post-arrest statement through Agent Martinez violated Salehi's confrontation rights, we would go on to consider whether the error was harmless.

"Without question, a *Bruton* error is one of constitutional dimension." *Richards*, 241 F.3d at 341. "Because of the significance of the error, we will affirm only if we find that the error is harmless beyond a reasonable doubt." *Id.* Here, assuming, but not deciding, that the admission of Sampson's statement violated Salehi's Sixth Amendment rights, any such error would be harmless beyond a reasonable doubt inasmuch as the government established overwhelming evidence of Salehi's participation in the drug conspiracy. This evidence, summarized above, included testimony from both Khan and the government's case-agent, both of whom detailed Salehi's participation in the distribution chain of the heroin used in the Salehi-Azzizi-Sampson 250-gram transaction. This testimony established that Salehi obtained the heroin on credit from Azzizi; gave it

on credit to Sampson for redistribution; and worked together with Azzizi and Sampson to negotiate a resolution when Sampson subsequently gave the heroin to a fourth party who was arrested before he could pay for it. Further, as discussed above, audio recordings of telephone conversations corroborated the testimony implicating Salehi.

Equally important, as we stated above in our summary of the facts, the content of these recorded telephone conversations was unusual. Salehi discussed with Azzizi and Sampson, at various times, "send[ing] it," a "deal," "work[ing] on that plan," a debt, the fact that Sampson "gave me one thirty and one twenty was left with him," "compensat[ion] for . . . losses," "bad stuff," and "reconcil[ing accounts]" — all without identifying, or even alluding to, the subject matter of their discussions or the item involved. Because it is atypical for people to engage in multiple discussions over a period of time in such manner, and because there was other evidence to support the inference, a reasonable jury was entitled to infer a conspiracy from the content of these recorded calls themselves. *See, e.g.,United States v. Smith,* 294 F.3d 473, 478 (3d Cir. 2002) ("The fact that a group of people, arguably with a common goal[,] . . . engage[] as a group in so many unusual acts could certainly lead a reasonable juror to the conclusion that there was at least a tacit agreement between the[m]."); *see also United States v. Barr*, 963 F.2d 641, 650 (3d Cir. 1992) ("It is well settled that a written or spoken agreement among alleged co-conspirators is unnecessary; rather, indirect evidence of [a] mere tacit understanding will suffice.") (internal quotations omitted).

More specifically, here, a reasonable jury was entitled to infer from these calls that the conspiracy involved drugs. As we observed in *United States v. McGlory*, 968 F.2d

309, 322 (3d Cir. 1992), members of a drug conspiracy, when speaking on the telephone, often use "guarded language." *Id.* For this reason and others, we therefore concluded in *McGlory* that, provided the taped conversations of co-defendants are relevant, "[t]heir weight [is] for the jury," and that "[i]n the context of all the evidence the jury ha[s] before it[,] . . . a lay inference that the parties['] cryptic statements referred to drugs and drug transactions [is] permissible." *Id.* at 324 n.9; *cf. United States v. Gambino*, 788 F.2d 938, 946 (3d Cir. 1986) ("That the determination of the weight of the evidence and inferences to be drawn . . . is exclusively within the province of the jury is a vital linchpin of our criminal justice system . . . . [t]he issue whether appellant's involvement in the heroin transactions for which he was convicted was solely a result of government inducement or rather, the result of a predisposed criminal mind as evidenced by his prior cocaine dealings, was properly left to the jury). Given the unusual and cryptic nature of the recorded conversations here, a reasonable juror could easily conclude the calls involved drugs. *See id.* For all of these evidentiary reasons we conclude that, even if Salehi's Sixth Amendment rights were violated, any error was harmless beyond a reasonable doubt.

As noted, Salehi raises a related contention, claiming the prosecutor misused Sampson's statement during closing argument. Review of the record confirms the District Court again instructed the jury after closing arguments to compartmentalize the evidence and to consider the evidence separately as to each defendant and each count. For the reasons we have discussed, even assuming the government's remarks concerning the Sampson statement were improper, any undue prejudice was prevented by the District

Court's limiting instructions issued to the jury after summation. More fundamentally, taken in the context of the trial as a whole, review of the prosecutor's remarks confirms they were not so prejudicial as to have deprived Salehi of a fair trial. We accordingly perceive no abuse of discretion. *See, e.g., United States v. Denardi*, 892 F.2d 269, 279 (3d Cir. 1989) (no relief required for government's improper summation remark where evidence of guilt was strong).

Salehi next contends the District Court erred in admitting evidence of alleged prior drug activities, contending they were introduced impermissibly as past "bad acts" to prove his propensity to traffic drugs. We review such evidence, admitted under Fed.R.Evid. 404(b), for an abuse of discretion. *United States v. Cruz*, 326 F.3d 392, 394 (3d Cir. 2003). Here, Salehi acknowledges that, once again, he faces a high burden: "On appeal, Rule 404(b) rulings may be reversed only when they are clearly contrary to reason and not justified by the evidence." *United States v. Murray*, 103 F.3d 310, 316 (3d Cir. 1997).

The record shows the District Court heard extensive argument on this issue before trial, reserving decision "on a proffer by proffer basis" contingent upon the government's ability to lay sufficient foundation for any such Rule 404(b) evidence that might arise during the course of the trial. The record also shows that the government satisfied the four-part test for admission of Rule 404(b) evidence, as set forth in *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988), as to each of the prior instances of conduct to which Salehi specifically objects: Salehi's drug transactions with Khan, Salehi's importation of drugs into the United States from Pakistan through Farid Sharifipour and Kathleen

VanAlstine, and the purchase of heroin from Salehi by a second cooperating government witness, Mark Wilson. In addition to ensuring the requirements of *Huddleston* were met, the District Court engaged in a proper analysis pursuant to Fed.R.Evid. 403, finding the evidence to have a probative value not substantially outweighed by its potential for unfair prejudice. The District Court also issued proper limiting instructions, the language of which was either drafted by, or agreed to by, Salehi. We therefore see no merit to this ground. *See Huddleston,* 485 U.S. at 691-92 (requiring evidence admitted pursuant to Rule 404(b) to have (1) a proper purpose; (2) relevance; (3) a probative value not substantially outweighed by potential for unfair prejudice; and (4) a proper limiting instruction); *see also United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002).

Finally, Salehi claims he was deprived of a fair trial as a result of cumulative errors. While we recognize a "cumulative error doctrine," we may reverse pursuant to that doctrine "only when the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quotation omitted). *See also United States ex rel Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980). None of the issues raised by Salehi on appeal are of sufficient weight to trigger the cumulative error doctrine here, and Salehi's conviction is therefore affirmed.

### C. Obaidullah Azzizi

After his challenge of the District Court's denial of his motion to sever, which we have discussed and rejected above, Azzizi next contends the District Court erred in failing to declare a mistrial when the government, in closing arguments against Azzizi,

18

mentioned testimony from cooperating government witness Mark Wilson that had only been admitted as against Salehi. The testimony from Wilson purportedly showed Salehi's selling price for heroin. As discussed *supra*, we review the District Court's denial of a mistrial motion based on the government's argument on summation for abuse of discretion. *United States v. Retos*, 25 F.3d 1220, 1228 n.10 (3d. Cir. 1994). Azzizi contends the government cross-referenced the Wilson/Salehi selling price to the March 30, 2001 three-way conversation between Salehi, Azzizi, and Sampson.

Counsel for Azzizi timely objected and requested a curative instruction, which the District Court gave after court resumed after a weekend recess. The District Court instructed the jury not to use anything Wilson said against Azzizi, and expressly built upon an earlier limiting instruction. Under the factors we articulated in *United States v. Gambone*, 314 F.3d 163 (3d Cir. 2003), the scope of the government's remarks in the overall context of its case against Azzizi were minimal, and the curative instruction has not been shown ineffective in assisting the jury to compartmentalize the evidence and arguments as among Appellants. Given the instruction, the scope of the remark, and the strength of the government's case against Azzizi, we perceive no abuse of discretion and therefore no basis for reversal. *See Gambone*, 314 F.3d at 179; *Government of V.I. v. Joseph*, 770 F.2d 343, 351 (3d Cir. 1985) (government's improper summation remarks did not warrant mistrial given, *inter alia*, court's instruction and substantial evidence of guilt). Certainly, no remark or argument by the government during closing arguments "'so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Moore v. Morton*, 255 F.3d 95, 105 (3d Cir. 2001) (quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also United States v. Young*, 470 U.S. 1, 11 (1985) (even "[i]nappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding").

Next, Azzizi claims insufficient evidence existed to prove his involvement in the conspiracies charged.[6]  While our review of a sufficiency of the evidence challenge is plenary, *United States v. Taftsiou*, 144 F.3d 287, 290 (3d Cir. 1998), it is highly deferential.  Our task is to determine whether there is substantial evidence, when viewed in the light most favorable to the government, to support the jury's verdict beyond a reasonable doubt.  *See, e.g., United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990).  In so doing, we must draw all reasonable inferences that support the verdict, *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998).  We will affirm so long as the evidence, so viewed, "would allow a rational trier of fact to convict."  *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001) (internal citation omitted).  As such, much like a challenge to a motion for severance, "a claim of insufficiency of the evidence places a very heavy burden on an appellant." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998).

There are three premises for Azzizi's insufficiency argument:  first, Azzizi claims, there was no proof of a transaction between Azzizi and Salehi except for the March 30, 2001 conversation; second, there was no evidence of a transaction or agreement between Azzizi and Sampson; third, only the improper admission against Azzizi of Sampson's

---

[6]  Appellant Sampson makes a similar claim, which we discuss *infra*.

post-arrest inculpatory statement and the Rule 404(b) evidence introduced against Salehi could explain the jury's conviction of Azzizi on the conspiracy count.

To establish Azzizi's participation in the charged conspiracy, the government had the burden to prove the following elements: "'(1) a unity of purpose between the alleged coconspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal.'" *United States v. Pressler*, 256 F.3d 144, 149 (3d Cir. 2001) (quoting *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999)).[7] Because this contention lies at the heart of Azzizi's appeal, as well as Sampson's, as discussed below, we pause to set forth in greater detail the relevant law in this Circuit distinguishing drug conspiracies from mere buyer-seller relationships.

The government "need[s] to show only that [a defendant] conspired with 'someone — anyone.'" *Id.* (quoting *United States v. Obialo*, 23 F.3d 69, 73 (3d Cir. 1994)). It "may prove these elements entirely by circumstantial evidence." *Gibbs*, 190 F.3d at 197 (citing *United States v. McGlory*, 968 F.2d 309, 321 (3d Cir. 1992)). "The existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" *Id.* (quoting *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986) (internal quotation omitted)). The government need not prove that each defendant knew all of the conspiracy's details, goals, or other participants. *Id.*

---

[7]  "[I]t is neither an element of 21 U.S.C. § 846 nor a constitutional requirement that a defendant have committed an overt act in furtherance of the conspiracy." *Gibbs*, 190 F.3d at 197 n.2.

As we have stated above in our analysis of Salehi's claims, the conspiracy agreement may be a tacit and unspoken one, and a jury may infer the existence of a drug conspiracy from unusual acts, such as cryptic telephone calls, alone. *See, e.g., Smith,* 294 F.3d at 478 ("The fact that a group of people . . . engage[] as a group in so many unusual acts could certainly lead a reasonable juror to the conclusion that there was at least a tacit agreement between the[m]."); *Barr*, 963 F.2d at 650 ("a written or spoken agreement among alleged co-conspirators is unnecessary; rather, indirect evidence of [a] mere tacit understanding will suffice") (internal quotations omitted); *McGlory*, 968 F.2d at 324 n.9 ("a lay inference [by the jury] that the parties['] cryptic statements referred to drugs and drug transactions [is] permissible").

Thus, while it is true that "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish [a conspiracy,]" *Gibbs*, 190 F.3d at 197, we acknowledged in *Gibbs* that "'even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that he or she was part of a larger operation.'" *Id.* at 198 (quoting *United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994)).

In several of our cases we have tallied the "factors" that may be considered in distinguishing between a mere buyer-seller relationship, on the one hand, and a conspiratorial relationship, on the other. These include whether there is an established method of payment, the extent to which transactions are standardized, and whether there is a demonstrated level of mutual trust. *See, e.g., Gibbs*, 190 F.3d at 199. Other "factors"

include the size of the transaction, whether the defendants have "put their heads together" to figure out planning, organization, and ways to conceal their activities, and whether purchases and sales among the defendants are made on credit. *Id.* (internal quotation omitted). As we specifically noted in *Gibbs*, a credit relationship may well reflect a demonstrated level of mutual trust. *Id.*[8]

At all times, given the sometimes fine line between drug conspiracies and buyer-seller relationships, *see, e.g., Pressler*, 256 F.3d at 150 ("in many drug cases, the principal question is whether the people who buy drugs from the primary dealer or from his or her confederates have joined the underlying conspiracy"), we must be mindful of Wharton's rule, which provides, "'[a]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission.'" *Iannelli v. United States*, 420 U.S. 770, 774 n. 5 (1975); *see also United States v. Phillips,* 959 F.2d 1187, 1190 (3d Cir. 1992).

With the foregoing in mind, our review of the record confirms there is ample evidence to support the jury's conviction of Azzizi. Viewing the evidence as a whole and in the light most favorable to the government, and making all reasonable inferences in its favor, *see Pressler*, 256 F.3d at 156, the government presented sufficient evidence to satisfy each of the elements necessary to support the charge of conspiracy. Beginning

---

[8]  We clarified these "factors" in *Pressler*, emphasizing they are not direct proof that a conspiracy exists but rather that "their presence serves as circumstantial evidence of the underlying agreement that is itself necessary to sustain a conspiracy charge." *Pressler*, 256 F.3d at 149.

with direct evidence, government witness Khan linked Azzizi to the 250-gram transaction by testifying that Azzizi gave this amount of heroin to Salehi, on credit. Khan also linked Azzizi to Salehi and Sampson with respect to the 250-gram transaction by testifying to the fact that all three conferred in person to discuss collection of the debt created when Sampson distributed the heroin without being paid for it. Khan was present for at least some of these three-way discussions. The third piece of direct evidence linking Azzizi to Salehi and Sampson was the March 30, 2001 recorded telephone conversation in which the three worked to resolve the problem. In this call, Azzizi dealt not only with Salehi, but also with Sampson; Azzizi went directly to Sampson at times in an attempt to remedy the problem, rather than looking only to Salehi.

Circumstantial evidence also links Azzizi to Salehi and Sampson. Because Azzizi gave Salehi the 250-grams of heroin on credit, and knew Salehi had in turn also given Sampson the heroin on credit, the jury could infer that these consignments (of not insignificant amounts of narcotics) on a credit basis were manifestations of mutual trust, as contemplated by *Gibbs*.[9] Similarly, the use of credit from Azzizi to Salehi to Sampson

---

[9]  The evidence of not one but two credit transfers, from Azzizi to Salehi and then from Salehi to Sampson, is especially probative. As we observed in *Gibbs*:

> A credit relationship may well reflect the kind of trust [constituting circumstantial evidence of a conspiracy], and often evidences the parties' mutual stake in each other's transactions. By extending credit to a buyer, the seller risks the possibility that the buyer will be unable to resell the drugs: even if the buyer does successfully resell the drugs, in this generally thinly capitalized "business," the seller will likely have to wait until the buyer collects the money from his resale before he can pay the seller back for the initial purchase. In addition, the buyer has a vested interest in the seller's ability to maintain a good working relationship with his supplier, since the buyer will not profit unless the drugs continue to flow from the seller's

could have been construed as an established method of payment as contemplated by *Gibbs*. Independently, the tenor, length, and context of the negotiations between Azzizi, Salehi, and Sampson after Sampson's buyer was arrested, as demonstrated both by recorded telephone conversations and as testified to by Khan, square with *Gibbs*' inquiry into whether Azzizi, Salehi, and Sampson "put their heads together" to figure out how to address a common problem or shared interest. *Gibbs*, 190 F.3d at 199. The jury could infer this because the three addressed not only the issue of money, but also Sampson's allegation that some of what he had been given was "bad." Finally, as stated in our analysis of Salehi's claims, the recorded telephone conversations themselves easily allowed a reasonable jury to infer that Azzizi was a participant in a drug conspiracy with Salehi and Sampson, given the unusual and cryptic nature of those calls. *See McGlory*, 968 F.2d at 324 n.9.[10]

Based on all of the foregoing, a rational jury could have found a conspiracy between Azzizi, Salehi, and Sampson beyond a reasonable doubt. Indeed, a rational jury could have easily found that the chain of credit-to-credit transfers from Azzizi to Salehi to

---

supplier to the seller.

*Gibbs*, 190 F.3d at 200.

[10] As discussed, additional circumstantial evidence supported this inference. Azzizi and Salehi often spoke using the pronoun "we" and discussed making future plans together. The jury heard evidence that Azzizi was aware of at least some parts of Salehi's dealings with Sampson, such as Salehi's providing Azzizi's heroin to Sampson on credit, and Salehi's initial attempts to work out a solution with Sampson. The jury also heard recorded conversations between Azzizi and Salehi contemplating deals that Azzizi wanted to make which he broached with Salehi, for which Salehi gave his apparent consent or approval.

Sampson, in combination with the efforts of the three to peaceably negotiate the successful resolution of a subsequent problem, "could not have been carried on except as the result of a preconceived scheme or common understanding." *Gibbs*, 190 F.3d at 197 (internal quotation omitted). We accordingly find sufficient evidence exists to support Azzizi's conviction.

Azzizi next argues, like Salehi, that his rights under the Confrontation Clause were violated when the District Court admitted, as against Sampson alone, Sampson's post-arrest statement about a March three-way telephone conversation. As we have discussed, Sampson stated there was a three-way call about a heroin transaction. While this evidence could by implication link the conversation of Azzizi, Salehi, and Sampson to heroin, the government had already independently recorded the three-way telephone conversation and identified the participants as Azzizi, Salehi, and Sampson. Further, as we have discussed, the government did not introduce Sampson's statement itself; rather, the substance of Sampson's statement was introduced through the testimony of government agent Martinez, and it did not contain or reference any redactions.

Azzizi, like Salehi, also argues that, notwithstanding the District Court's limiting instruction, the introduction of Sampson's statement violates *Bruton.* As stated, our review is plenary. *Trala*, 386 F.3d at 543. For the reasons we have already discussed, we conclude that there was no violation of *Bruton* and its progeny. If we were to assume the introduction of Sampson's post-arrest statement through Agent Martinez violated Azzizi's confrontation rights, we would go on to consider whether the error was harmless.

As we have already observed, "[w]ithout question, a *Bruton* error is one of

26

constitutional dimension." *Richards*, 241 F.3d at 341. Thus "we will affirm only if we find that the error is harmless beyond a reasonable doubt." *Id.* Here, assuming, but not deciding, that the admission of Sampson's statement violated Azzizi's Sixth Amendment rights, any such error would be harmless beyond a reasonable doubt inasmuch as the government established overwhelming evidence of Azzizi's participation in the conspiracy. This evidence is summarized above in our analysis of Azzizi's insufficiency claim, our analysis of Salehi's *Bruton* claim, and our factual summary at the outset of this opinion. For these evidentiary reasons we conclude that, even if Salehi's Sixth Amendment rights were violated, any error was harmless beyond a reasonable doubt.

Azzizi next argues his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments was violated because the District Court ordered Azzizi to be shackled at trial, allegedly without reason. Unfortunately, the record on this point is scant at best. At argument, counsel for Azzizi and the government appeared to agree that Azzizi was shackled from the very first day of trial. Nevertheless, there is no indication in the record that the jury ever saw Azzizi in shackles, and the table at which Azzizi sat had a modesty panel. It is unclear whether any other tables in the courtroom were also draped. The record is also silent as to the exact reason or justification for shackling Azzizi during trial. The record shows that although counsel objected to Azzizi's shackling more than once, she did not develop the record outside the presence of the jury to show specific facts suggesting prejudice.

With respect to the objections made by counsel for Azzizi, the only response from the District Court that appears in the record before us is the word "[y]es" in response to

her second objection. At argument, counsel for the government suggested this meant that the judge's original consideration of Azzizi's first shackling objection, which was not in the record, would stand, *i.e.,* the District Court was not changing its mind. It is therefore unclear why the District Court agreed (apparently with the U.S. Marshals) that Azzizi required shackling.

Measures such as shackling indisputably require "close judicial scrutiny." *Estelle v. Williams*, 425 U.S. 501, 504 (1976). Without a proper record, we are troubled by the shackling the District Court authorized in this case.

As the Supreme Court most recently recognized in *Deck v. Missouri*, ___ U.S. ___, 125 S.Ct. 2007 (2005), "judges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Id.* at 2013. Prior to *Deck*, we last discussed the implications of, and the minimum requirements for, shackling in *Szuchon v. Lehman*, 273 F.3d 299 (3d Cir. 2001). There, quoting *Illinois v. Allen*, 397 U.S. 337 (1970), we observed that even where, as here, shackles are not visible to the jury, "'the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Szuchon*, 273 F.3d at 314 (quoting *Allen*, 397 U.S. at 344).

In *Szuchon*, we concluded — based on a clear record — that shackling was justified. Szuchon assaulted a witness in open court as that witness left the stand, and Szuchon had "displayed a pattern of disruptive conduct prior to the assault." *Id.* The

28

record also showed that the trial court had "carefully weighed but rejected alternatives to shackling." *Id.* In addition, Szuchon's counsel had stated he had no objections to the use of the shackles. *Id.* at 315. As a result, we concluded that the trial court had a reasonable basis for shackling, because the record "fully support[ed]" the trial court's exercise of discretion. *Id.*

Courts may not adopt a general policy of shackling all defendants at trial. Both Supreme Court authority and our controlling precedent require the development of a factual record by the District Court justifying a particularized need to shackle or otherwise restrain an individual defendant during trial. Such a factual record could come from any proper source, such as the government, the Marshal's Service, the defendant's criminal record, or the Court's observations. No such record exists here, although Azzizi's counsel objected at least twice to the use of shackles.

Without such a record we will assume, but not decide, that the District Court's decision to shackle Azzizi was improper. We nevertheless conclude the error was harmless beyond a reasonable doubt because there is no evidence the jury ever saw or knew of the shackles, or that it interfered with the trial, and because there was ample evidence — summarized above in our discussion of Azzizi's claim of insufficient evidence — of Azzizi's participation in the 250-gram heroin conspiracy. Accordingly, even if the shackling of Azzizi at trial was not supported by a proper record, we will not overturn his conviction on this ground.

Azzizi next claims his right to a speedy trial was violated because he was incarcerated in pre-trial detention for fifteen months. We review time determinations

29

made under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, for abuse of discretion, although our review of a District Court's interpretation of the Speedy Trial Act is plenary. *See United States v. Lattany*, 982 F.2d 866, 870 (3d Cir. 1993) (district court's decisions to grant continuances reviewed for abuse of discretion); *United States v. Arbelaez*, 7 F.3d 344, 346 (3d Cir. 1993). Conceding that many, if not most, of his fifteen months in pre-trial detention were non-violative delays due to a variety of permissible circumstances, and acknowledging further that his sentence has been reduced by this number of months as time-served, Azzizi nonetheless argues his rights were violated when the government elected to change its theory of its case at the last minute.

The Speedy Trial act allows district courts to grant continuances that serve the ends of justice. 18 U.S.C. § 3161(h)(8)(A). Here, our review of the record and docket sheets confirms the District Court did not abuse its discretion. Between the three months from the time Azzizi was arraigned on the Superseding Indictment and the time he went to trial, the District Court responded to pre-trial motions from Salehi, Sampson, and Azzizi himself, as well as one co-defendant's positive tuberculosis test. As for Azzizi's fifteen month pre-trial detention, we have held that a pre-trial incarceration of fourteen-and-a-half months does not demonstrate a *per se* violative pre-trial delay. *See Hakeem v. Beyer*, 990 F.2d 750, 761 (3d Cir. 1993). Moreover, "[w]e are unwilling to infer prejudice based on incarceration that the defendant would ultimately have had to serve solely because fourteen and one-half months had elapsed between arrest and trial." *Id.* We will accordingly not disturb the conviction of Azzizi on this ground, either.

Finally, Azzizi claims his conviction must be reversed because a Pashto language

interpreter was not present during a post-trial proceeding at which his counsel argued for a new trial. Azzizi grounds his claim in the Court Interpreters Act of 1978, 28 U.S.C. § 1827. While we have not decided the issue, other Circuits have concluded that district courts are to be afforded discretion in implementing the Act. *See, e.g., United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir. 2003). The record establishes that a proper exercise of discretion occurred here. The District Court scheduled a Pashto interpreter; upon that interpreter's unexpected absence, the District Court provided Azzizi with a transcript of the post trial proceedings. Azzizi cites no authority suggesting this solution constitutes an abuse of discretion.

D.  Abdul Qaher Sampson

After his claim arising from his denied motion for severance, which we have already discussed and rejected, *supra*, Sampson next argues the evidence adduced at trial showed him to be in a mere buyer-seller relationship with Salehi and Azzizi. As with Azzizi's similar contention, which we considered at length and rejected above, Sampson draws our attention to the requirements of *Pressler* and argues the government has not met its evidentiary burden with respect to his involvement in the 250-gram heroin transaction.

Unlike Azzizi, however, who timely preserved his objection, Sampson concedes that we may review his claim only for plain error because he did not preserve this contention below. *See United States v. Olano*, 507 U.S. 725, 734 (1993); Fed.R.Crim.P. 52(b). Sampson must thus show an error that is plain and that affects substantial rights. *See, e.g., United States v. Cotton*, 535 U.S. 625, 631-32 (2002). In order to "affect

31

substantial rights," an error must be "prejudicial, *i.e.*, it 'must have affected the outcome of the district court proceedings.'" *United States v. Nappi*, 243 F.3d 758, 762 (3d Cir. 2001) (quoting *Olano*, 507 U.S. at 734). In addition, we may exercise our discretion to notice such plain error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., Cotton*, 535 U.S. at 631-632.

We have already summarized the applicable law, most importantly our decisions in *Gibbs* and *Pressler*, in our discussion of Azzizi's insufficiency of the evidence claim. We have also already summarized, in both our fact summary and our analysis of Azzizi's claims, the facts and inferences upon which a jury could have reasonably relied in convicting Sampson. Because Sampson concedes that plain error review applies, the showing he faces is severe. "A conviction based on insufficient evidence is plain error only if the verdict constitutes [']a fundamental miscarriage of justice.'" *United States v. Thayer*, 201 F.3d 214, 219 (3d Cir. 1999) (quoting *United States v. Barel*, 939 F.2d 26, 37 (3d Cir. 1991)). The miscarriage must be "so clear that the trial judge and prosecutor were derelict in even permitting the jury to deliberate." *United States v. Wright-Barker*, 784 F.2d 161, 170 (3d Cir. 1986), *superseded on other grounds by statute*, *United States v. Martinez-Hidalgo*, 933 F.2d 1052 (3d Cir. 1993). Given this standard, we conclude the evidence was more than sufficient to factually support Sampson's conviction, and we will not disturb it. *See Pressler*, 256 F.3d at 147; *see also Gibbs*, 190 F.3d at 199-200 (3d Cir. 1999).

Sampson next contends he was improperly charged with participating in a single conspiracy with Salehi and Azzizi even though the trial evidence showed two separate

conspiracies, one, among Sampson and Salehi; the other, among Salehi and Azzizi. Here again, Sampson concedes that plain error review applies. As such, as we have stated above, Sampson must demonstrate that this alleged error was plain and affected substantial rights, *Cotton*, 535 U.S. at 631-32, meaning that it "must have affected the outcome of the district court proceedings." *Nappi*, 243 F.3d at 762 (internal quotation omitted). As before, we may exercise our discretion to notice such plain error only if it seriously affected the fairness, integrity, or public reputation of the proceedings below. *Cotton*, 535 U.S. at 631-632. For the reasons we have already discussed, we do not discern plain error and we will not disturb the jury's verdict on this ground.

We have considered all other arguments advanced by Appellants with respect to their challenges of their judgments of conviction, and conclude that further discussion is not warranted.

III.

What remains are Appellants' challenges of their judgments of sentence.

A. Quinton Yates

Yates contends his Sixth Amendment rights were violated when the District Court heard additional evidence and made an additional finding as to Yates' role as a leader or organizer pursuant to § 3G1.1 of the Sentencing Guidelines, resulting in his increase from a level 30 to a level 34 offender and thus violating the maximum sentence authorized by the facts established by Yates' guilty plea. We deem this to be a challenge under *Booker* and, having determined the sentencing issues that Yates raises are best determined by the District Court in the first instance, we vacate Yates' sentence and remand for sentencing

33

in accordance with *Booker*. *See United States v. Davis*, 407 F.3d 162 (3d Cir. 2005).[11]

### B.  Sher Mohammad Salehi

Salehi contends the District Court enhanced his sentence in violation of his Sixth Amendment rights by making findings that he was a leader or organizer pursuant to § 3G1.1.  We deem this to be a challenge under *Booker* and, having determined the sentencing issues that Salehi raises are best determined by the District Court in the first instance, we will thus vacate the sentence and remand for sentencing in accordance with *Booker*.  *See Davis*, 407 F.3d 162, *supra*.

### C.  Abdul Qaher Sampson

Appellant Sampson also alleges a Sixth Amendment violation, claiming the District Court sentenced on a basis of 450 grams, not the "100 grams or more" referenced in each of the two Counts in the Superseding Indictment.  We likewise determine that the sentencing issues that Sampson raises arise under *Booker* and are best determined by the District Court in the first instance.  Accordingly, we vacate the sentence and remand for sentencing in accordance with *Booker*.  *See Davis*, 407 F.3d 162, *supra*.

### D.  Obaidullah Azzizi

Counsel for Azzizi informed the Court at argument that Azzizi has already been re-sentenced consistent with *Booker*.  We accordingly dismiss Azzizi's challenge to his judgment of sentence as moot.

---

[11]  We thus need not decide the remaining sentencing issues raised by Yates in his brief, *i.e.*, whether the District Court erred in failing to grant a downward departure given Yates' unusual family ties, responsibilities, and/or the conditions at the Passaic County Jail.

## IV.

In sum, we will affirm the judgments of convictions as to all Defendant/Appellants. We will remand for re-sentencing the judgments of sentence for Defendant/Appellants Yates, Salehi, and Sampson in accordance with *Booker*. The challenge of Defendant/Appellant Azzizi to his judgment of sentence will be dismissed as moot.

*U.S. v. Salehi* – Nos. 03-3417/3419

*U.S. v. Sampson* – No. 03-3418

*U.S. v. Azzizi* – No. 03-3916

*U.S. v. Yates* – No. 03-3430


McKEE, *Circuit Judge* (concurring in part and dissenting in part).

I agree with all of the Majority's analyses except my colleagues' conclusion that the evidence was sufficient to prove the conspiracy charged in Count One beyond a reasonable doubt, and the related holdings. As I explain below, I do not think the government proved the agreement required to convict for that conspiracy. Sampson did not raise this argument in the District Court, and my colleagues therefore correctly note that we review only for plain error. *See* Maj. Opn. at 31. However, I would reverse the conviction on Count One because the failure to prove an essential element of that conspiracy constitutes plain error under Fed.R.Crim.P. 52(b). *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001).[12]

## I.

As my colleagues explain, in reviewing the sufficiency of the evidence, we must view the evidence introduced at trial in the light most favorable to the government and

---

[12] As my colleagues note, these three defendants raise a total of nearly 20 claims of reversible error. However, because I only disagree with the majority's analysis of the challenge to the convictions in Count One, I need not discuss the remaining claims. The *Bruton* challenge pertains to a statement that was used to prove the charges in that Count, and the evidence was clearly sufficient to prove the distributions and other conspiracy charged in the indictment. Accordingly, I will limit my discussion to the Count One conspiracy.

affirm the conviction if the evidence, so viewed, is sufficient to establish a conspiracy beyond a reasonable doubt.

Viewing the evidence in that light, the government established that Sampson and Salehi had known each other for a long time, and their families had also known each other for a long time. In early 2001, Salehi asked Khan if he (Khan) had sold heroin to Sampson, and Khan admitted that he had. Khan then took a week-long vacation to California. While he was gone, Salehi agreed to sell 250-grams of heroin to Sampson on his own.

Khan testified that when he returned from California, around January 2001, he learned that Salehi had sold the heroin to Sampson and that he had sold it on credit. Salehi had also obtained that heroin from Azzizi on credit. Sampson had not yet paid Salehi because Sampson's buyer had been arrested before he could pay Sampson. Accordingly, Sampson was indebted to Salehi, and Salehi was indebted to Azzizi, because Salehi was going to pay Azzizi with the money Salehi was to receive from Sampson.

In February 2001, Salehi and Azzizi went to Sampson's store in an attempt to collect the debt from Sampson. There, they met with Sampson and another person Sampson claimed to have given the heroin to, and they argued about the debt. Afterwards, with the assistance of Khan, the parties decided to negotiate. Sampson, Khan and Salehi met at the store, and Sampson and Salehi negotiated a settlement in Khan's presence. Sampson agreed to pay Salehi $3,000 and to return a portion of the heroin he had received. However, Sampson apparently never intended to give Salehi the

$3,000. Concomitantly, Salehi apparently never intended to be satisfied with only $3,000. Rather, Khan explained at trial that Salehi and Sampson were both "just playing each other."

Ultimately, according to Khan, Sampson gave Salehi approximately 100 grams of heroin, however, Sampson did not give Salehi any money. Thereafter, Salehi telephoned Sampson several times, in Khan's presence, demanding payment. In addition, Khan was in Salehi's presence on one occasion when Salehi spoke to Azzizi by phone and assured Azzizi that he (Salehi) would pay Azzizi for the heroin Salehi had purchased from Azzizi.

In March 2001, Khan was with Salehi when Salehi met with Azzizi. Khan heard Azzizi asking Salehi to satisfy his debt with him because Azzizi needed the money for a trip to Pakistan. According to Khan, Salehi told Azzizi to go to Pakistan and assured Azzizi that he would send him the money there.

Intercepted telephone calls in March 2001 provided more detail regarding the unresolved debt. For example, in a conversation between Azzizi and Salehi on March 24, 2001, Azzizi complained about having no money and told Salehi that he wanted to sell Salehi's car. Salehi replied that the car was registered in the name of someone they referred to as "Chowdry" and that they (i.e., Salehi and Azzizi) owed Chowdry money. Azzizi replied that they really did not need the car.[13]

In response to Azzizi's request for money, Salehi told Azzizi to call Qahir

_____

[13] The government argues that Azzizi and Salehi referred to themselves as "we," and that is additional proof of a conspiratorial agreement. Given the totality of circumstances here, I don't agree.

38

(Sampson) and Azzizi replied, "the hell with Qahir."   Azzizi and Salehi then discussed other matters, including the "rate in Canada."  During that call, Salehi directed Azzizi to collect an amount from another person named "Zahid," and to keep "40" for himself. Salehi also told Azzizi: "you are my dear friend, I always trust you."

In an intercepted call on March 30, 2001, Salehi called Azzizi in Pakistan to complain that Sampson still had not paid the debt, which was now three months old. Salehi told Azzizi that "[Sampson] accuses me of ripping you off."  Salehi then put Azzizi on hold while he linked Sampson into the call.   The three then began to discuss settling the debt.  That discussion involved  $2,000 or $3,000, and an unidentified product in the amounts of "130" and "120."  However,  Sampson complained that he should be compensated because the product had been "bad."

Azzizi then questioned Sampson's intentions and asked why Sampson had been avoiding the debt.  Sampson promised to pay Salehi $2,000, and said he understood that Salehi owed the money to Azzizi.  Salehi and Sampson then began to argue over whether Sampson still owed Salehi $3,000, as Salehi maintained, or only $2,000, as Sampson maintained.

Salehi told Azzizi that Sampson gave him 130 and that Sampson had retained 120. During its closing argument at trial, the government maintained that "130" and "120" referred to heroin because it adds up to the 250 – grams of heroin that Salehi had given Sampson on credit.  Thus, the government's theory was that Sampson returned 130 grams of heroin to Salehi, but kept 120 grams without paying for it, and that this was part

of the settlement for having received "bad" heroin from Salehi.[14]

## II.

Even when viewed in the light most favorable to the government, this evidence does not establish a single conspiracy consisting of Azzizi, Salehi and Sampson. Rather, it shows two sales, both on credit. The first was from Azzizi to Salehi, and the second was the resale from Salehi to Sampson. I believe that, under our decision in *United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001), the government failed to prove the underlying agreement required to establish the conspiracy charged in Count One.

In *Pressler*, Pressler and Shreffler were indicted for conspiracy to distribute heroin. At trial, the government proved that Shreffler "obtained and distributed a large amount of heroin," primarily from Pedro "Pete" Caban. *Id*. at 146. Caban also sold to several others, and some of those purchasers resold the drugs they bought from Caban. Shreffler knew that Caban was selling to others, and that many of those purchasers resold the heroin themselves. Shreffler also knew that Pressler was buying heroin from Caban and that Pressler was reselling that heroin to many of the same customers that Shreffler was selling the heroin he purchased from Caban to. *Id*. at 150. The evidence also showed that Pressler knew his buyers had other sources of heroin, and he knew that that source was frequently Pressler.

Pressler and Shreffler appealed their convictions for conspiracy arguing, in part, that the evidence showed only a buyer/seller relationship, and that the government had

_____

[14] Toll records indicated that Azzizi telephoned Salehi's home 37 times in February 2001, and that Azzizi placed at least one call to Sampson's store on March 2, 2001, lasting four minutes.

failed to prove the agreement that is the *sine qua non* of conspiracy. The government

argued that the underlying agreement was established because Shreffler's buyers "were

not simple purchasers of drugs from Shreffler; they knew that Shreffler obtained heroin

from Pete. . . and they knew about one another and about Shreffler's distribution to other

persons." *Id*. at 152 (internal quotation marks omitted).

In *Pressler*, the government relied heavily on *United States v. Gibbs*, 190 F.3d 188

(3d. Cir. 1999), in arguing that the evidence was sufficient to prove a conspiracy between

Shreffler and Pressler beyond a reasonable doubt. In rejecting the government's claim,

we analyzed *Gibbs* in depth and explained why the conviction of Shreffler and Pressler

was not governed by *Gibbs*. Accordingly, in order to better understand our decision in

*Presseler*, it is also necessary to take a closer look at *Gibbs*, as summarized in our

discussion in *Pressler*:

> In upholding the conviction in *Gibbs*, we stressed that Sydnor
> (the buyer) had been aware that Gibbs (the seller, who was
> unquestionably a member of a drug conspiracy) sold drugs to
> people other than himself, and emphasized that Gibbs had
> known that Sydnor resold drugs that he bought from Gibbs to
> other people. That Sydnor knew that Gibbs sold drugs to
> many other people was circumstantial evidence that Sydnor
> knew that Gibbs was part of a larger distribution ring, and the
> fact that Gibbs was aware that Sydnor resold the drugs that he
> got from Gibbs was circumstantial evidence that Sydnor was
> a part of that ring.

*Pressler*, 256 F.3d at 152-53 (citatations omitted).

My colleagues stress that the evidence here allowed the jury to conclude that

Azzizi sold to Salehi, and that Salehi in turn sold to Sampson and that Sampson knew of

Azzizi's sale to Salehi. The majority places particular reliance on the fact that both sales

41

were on credit, and that both pairs of sellers and buyers knew about the other pair. *See* Maj. Op. at 4. However, the majority's analysis largely ignores our caution in *Pressler* that "the mere fact that a defendant comprehends that a person from whom he or she buys drugs or to whom he or she sells drugs also sells drugs to others is not itself sufficient proof that the defendant and the other person are conspirators." *Pressler*, 256 F.3d. at 153.

Thus, although my colleagues acknowledge that the *Wharton* rule is violated when the government attempts to fashion a conspiratorial agreement from an underlying offense requiring two people (such as an illegal sale and purchase), *see* Maj. Op. at 23, its analysis does exactly that.[15] As we noted in *Pressler*, "[e]xcept for those who grow, harvest, or process controlled substances themselves, all users and dealers get their drugs from someone else." 256 F.3d at 153. We also explained in *Pressler*: "[t]he fact that several of Shreffler's buyers knew that Shreffler often got his drugs from Caban and that they knew about each other is not enough to establish an *agreement* among them to distribute heroin." *Id.* at 153 (emphasis added). I believe that is all we have here.[16]

The majority's analysis makes the evidence of an underlying agreement appear

---

[15] Wharton's rule provides: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *United States v. Phillips*, 959 F.2d 1187, 1190 (3d. Cir. 1992) (*citing*, 1 Anderson, Wharton's Criminal Law and Procedure § 89, 191 (1957)).

[16] In its brief here, the government attempts to distinguish *Pressler* by arguing that that case "involved two independent drug dealers who often had the same source of supply." Appellee's Br. at 29. That is true, but that is not a distinction. Rather, it is the result of our conclusion that the government failed to establish a conspiratorial agreement between Shreffler and Pressler.

42

stronger than it is because my colleagues place undue weight on the fact that Azzizi's sale to Salehi, and Salehi's resale to Sampson were both on credit. That does not help establish an "agreement," it only states the terms of the two sales. As I shall explain, the other factors the majority relies upon to find sufficient evidence of a conspiracy all flow from, and are the result of, the credit terms of the two sales that are charged as a conspiracy in Count One. Experience teaches that, absent more than appears on this record, a credit sale is not so unique in the illegal drug trade that it evidences an underlying agreement beyond the sale itself.[17]

"[A] conspiracy requires an agreement to commit some other crime beyond the crime constituted by the agreement itself." *Pressler*, 256 F.3d at 151 (citation and internal quotation marks omitted). We also explained in *Pressler* that the "'factors' that tend to show the existence of a conspiracy . . . are not direct proof that a conspiracy exists; rather, [they are] circumstantial evidence of the underlying agreement that is itself necessary to sustain a conspiracy charge." *Id.* at 149 (citing *United States v. Kapp*, 781 F.2d 1008, 1010 (3d. Cir. 1986)). To better understand that the "factors" the majority relies upon to sustain the conspiracy here are nothing more than evidence of two illegal drug sales, it is also helpful to consider our discussion of *United States v. Powell*, 113 F.3d 464 (3d. Cir. 1997) in *Pressler*. There, we summarized *Powell* as follows:

---

[17] In the myriad number of drug cases that come before the appellate courts, it is not at all uncommon to see evidence that drugs were "fronted;" meaning only that the buyer was sold drugs on credit. As the court explained in discussing just one such situation in *United States. v. Witek*, 61 F.3d 819, 820 (11th Cir. 1995), "[s]ales were at the going market price and often involved 'fronting'--allowing the customer to pay for the drugs after delivery."

43

> A witness testified that James and Antonio Powell lived
> together, that they both sold cocaine, that they shared plastic
> bags to package the cocaine, and that if one of the brothers
> ran out of cocaine to sell, the other brother would supply it. . .
> . James Powell assured a police informant that the cocaine
> the Powell brothers would sell the next day would match in
> quality the cocaine sold earlier by Antonio Powell.   During a
> recorded telephone conversation, Antonio Powell consulted
> James Powell before setting the sales price for cocaine, and
> James Powell also served as a lookout and driver when
> Antonio Powell sold cocaine to an undercover agent.

*Pressler*, 256 F.3d at 154-55 (citing *Powell*, 113 F.3d. at 467).  During our discussion in

*Pressler*, we focused on the following factors in explaining why the evidence had

established a conspiracy in *Powell*: 1) James Powell had acted as a lookout for Antonio

when the latter conducted drug sales; 2) the two sometimes consulted each other "before

setting a sales price for a given deal;" and 3) they shared packaging materials and thereby

"demonstrated that they had integrated their activities." *Pressler*,  at 155.

Our discussion in *Pressler* also compared the *Powell* factors with the evidence that

had been sufficient to prove a conspiracy in *Gibbs*.  First, we noted that, in *Gibbs*, there

was evidence that  "Sydnor (the buyer) had offered to provide physical protection for

Gibbs (the seller) [this showed] [t]hat Sydnor . . . had a greater stake in [the seller's]

safety than a typical buyer, which in turn implied that a cooperative relationship existed

between the two of them." *Id.* (*citing Gibbs*, 190 F.3d at 201).  Second, "[t]here was

evidence that Gibbs had sold Sydnor drugs on credit' which meant that each had an

economic stake in the other's continued success." *Id.* (citing *Gibbs*,190 F.3d at 201).

This is the one factor that supports the conviction on Count One and the majority focuses

on it.  However, as I suggested above, and discuss more fully below, without more, the

fact that the drugs in Count One were "fronted" does not suggest anything more than the credit terms of the sale. It does not prove a "prior or contemporaneous understanding beyond the sales agreement itself. . . [,]" and it "is insufficient to establish that the buyer was a member of the seller's conspiracy." *Gibbs*, 190 F.3d at 197.

In *Gibbs*, there were numerous transactions involving the "buyer" and "seller," and numerous coded telephone calls involving them, and others. Significantly, the code involved there was "virtually incomprehensible to the untrained ear." *Gibbs*, at 196. It was more significant than a call evidencing little more than a common sense understanding that it is not a good idea to say "heroin" on the telephone when discussing illegal drug sales. Discussions between Sampson, Azzizi and Salehi were not so involved or complicated that a party who knew they were discussing an illegal drug sale could not figure out precisely what they were saying. The "code" here neither requires nor suggests "a considerable degree of coordination and [the] existence of a cooperative relationship." *Pressler*, 256 F.3d at 155. Accordingly, the "code" at issue here, is not nearly as probative of a conspiratorial relationship as the "incomprehensible" discussion in *Gibbs* because this conversation does not suggest a high level of coordination between the participants.

Here, we have a credit sale, and a resale. The Count One conspiracy does not include a long series of transactions, and Azzizi's stake in Sampson's debt to Salehi is therefore limited to Sampson's ability to pay for the drugs Salehi fronted to Sampson. It does not suggest the actors had any interest in the "continued success" of any overarching enterprise. In *Gibbs,* Gibbs and another conspirator "used and attempted to use acts of

45

violence to further the conspiracy." 190 F.3d at 195. There is no evidence that these actors had such a mutuality of interest that one was willing to threaten violence to collect the debt of another.

It is also important to note that in *Pressler*, we noted that knowledge that one is "part of a larger operation," is more probative of membership in a conspiracy when "it is clear that a drug conspiracy existed," but such knowledge is "singularly unhelpful where the question is whether the 'larger operation' was present at all." 256 F.3d at 152. Indeed, a contrary view would violate the *Wharton* rule and give rise to a conspiracy whenever there is a sale of illegal drugs (particularly when there is a resale), because all participants in any such transaction beyond the initial manufacture and distribution of the drug, knows that others have been involved in the sales network.

My colleagues summarize the direct evidence relied upon to sustain the conviction on Count One. First, Azzizi fronted the drugs to Salehi "and knew Salehi had in turn also given Sampson the heroin on credit . . . ." *See* Maj. Op. at 24. According to the majority, the credit transactions "could have been construed as an established method of payment as contemplated by *Gibbs*." *Id.* Similarly, the majority believes that "the tenor, length, and context of the negotiations between Azzizi, Salehi, and Sampson after Sampson's buyer was arrested, . . . square with *Gibbs'* inquiry into whether [they] 'put their heads together' to figure out how to address a common problem or shared interest." *Id.,* at 25 (*citing Gibbs*, 190 F.3d at 199). The majority believes that "[t]he jury could infer this because the three addressed not only the issue of money, but also Sampson's allegation that some of what he had been given was "'bad.'" *Id*  Lastly, as suggested by

my discussion of the purported code, the majority claims the nature of the recorded telephone conversations "themselves easily allowed a reasonable jury to infer that Azzizi was a participant with Salehi and Sampson, given the unusual and cryptic nature of those calls." *Id*., at 25. My colleagues cite *United States v. McGlory*, 968 F.2d 309, 324 n.9 to support this latter conclusion.

I have already explained why the "cryptic" nature of the calls here is not as probative of a conspiracy as it might otherwise have been. In addition, I note that the cited portion of *McGlory,* did not address the sufficiency of the proof of a conspiracy. Rather, the issue discussed in that footnote was whether the jury could have concluded that certain excerpts the government had introduced at trial from recorded conversations involved drugs. Judge Becker wrote a concurring opinion in which he argued that an expert should have been called to tie the conversations to a drug conspiracy. The majority rejected that position explaining: "[i]n the context of all the evidence the jury had before it in this particular case, we think a lay inference that the parties *(sic)* cryptic statements referred to drugs and drug transactions was permissible." *McGlory*, 968 F.2d at 324 n.9.

The majority stretches reliance on the terms of the sale here even further by suggesting that "the chain of credit-to-credit transfers . . . , in combination with the efforts of the three to peaceably negotiate the successful resolution of a subsequent problem, 'could not have been carried on except as the result of a preconceived scheme or common understanding.'" Maj. Op. at 25-6 (*citing Gibbs*, 190 F.3d at 197). I frankly don't understand that conclusion, nor do my colleagues explain it. No underlying agreement

beyond the sale and resale in Count One  was required to "peaceably negotiate" payment. No "preconceived scheme of common understanding" was required for Azzizi to know that it was in his interest for Sampson to pay Salehi so that Salehi would have money to pay him.

Similarly, the fact that the negotiations were  "peaceful" proves nothing.  We are all too familiar with examples of members of a criminal enterprise resorting to violence to enforce discipline and maintain the "respect" and fear of confederates to conclude, without more than appears on this record,  that peaceful negotiation somehow makes a conspiracy more likely.  Moreover, as noted above, in *Gibbs*, we thought it significant that the "use[] and attempted use [of] acts of violence to further the conspiracy" was relevant to the existence of a conspiracy.  190 F.3d at 195.  I don't understand how the peaceful negotiations here would be probative of anything other than efforts to collect the underlying debt absent speculation that peaceful negotiation is somehow probative of an illegal conspiracy.  If the use of violence is probative of a conspiratorial relationship as suggested in *Gibbs*, I fail to see how peaceful negotiation is also probative of an illegal agreement.

The other factors the majority relies upon are also harvested from the single factor of the terms of these two sales and the conclusions the majority attempts to draw from those factors also are more akin to speculation than inference based upon this record.

For example, the fact that "all three conferred in person to discuss collection" of Sampson's debt does not advance an inquiry into whether there was an agreement beyond the failure to pay the respective sellers.  If the "in person" meeting is relevant to an

agreement separate from Sampson's agreement to pay Salehi and Salehi's agreement to pay Azzizi, then the subsequent phone conversations were not all that relevant to the existence of a conspiracy. The converse is also true. If the subsequent phone conversations are relevant to an underlying agreement, then I fail to see how a meeting "*in person* to discuss collection," advances our inquiry. There is nothing here to suggest that coconspirators are more likely to meet in person to discuss a debt owed among themselves than persons who have agreed to do nothing more than buy and sell illegal drugs. That is particularly true where, as here, the actors and their families have known each other for a long time.

The majority also thinks it significant that Azzizi not only gave Salehi the 250-grams of heroin on credit, but that Salehi "had in turn also given Sampson the heroin on credit . . ." Maj. Op. at 24. Once again, that shows nothing other than a credit sale. It only establishes that payment wasn't expected when the drugs were delivered. Moreover, that factor is somewhat misleading because the record does not establish that Azzizi knew that Salehi would resell to Sampson, let alone that the drugs would be sold on credit.[18] The evidence only established that Sampson's resale was on credit, not that Salehi or Azzizi approved that method of sale in advance, or even had advance knowledge that credit

---

[18] I see nothing on this record to support a conclusion that Azzizi even knew that Salehi would resell the drugs when Salehi received them from Azzizi. It is possible that the size of the transaction (250-grams) would suggest further distribution, but the government never tried to use the quantity of the sale to suggest to the jury that Azzizi knew there would be a resale. However, absent expert testimony to that effect, the jury would have had to speculate to reach that conclusion. Moreover, all of this assumes that that knowledge by Azzizi would support the finding of a conspiratorial agreement beyond a reasonable doubt. As set forth above, *Pressler* does not allow that conclusion on this record.

would be extended to the buyer.[19]  Furthermore, at the risk of redundancy, it bears repeating that, even if we assume *arguendo* that any or all defendants had such advance knowledge, it would still establish nothing more than that the terms of the sales without more than we have here.

Similarly, I am not convinced of the significance of the "tenor, length, and context of the negotiations between Azzizi, Salehi, and Sampson after Sampson's buyer was arrested" or that they "'put their heads together' to figure out how to address a common problem or shared interest," as discussed in *Gibbs* and *Pressler*. Maj. Op. at 25.  That evidence shows that they "put their heads together" so that each could be paid for their own respective sale insofar as the charges in Count One  are concerned.  It does not suggest a broader agreement.

Thus, I am also not convinced that a reasonable inference can arise from the fact of Sampson's allegation that "some of what he had been given was 'bad.'"  *See* Maj. Op. at 25.  Sampson was simply telling his seller that he (Sampson, the buyer) was not going to pay for defective merchandise.  The entire discussion of  "bad stuff" goes only to the quality of the drugs that were sold and a concern that payment would not be received if those drugs were "bad."  In fact, the jury could just as readily conclude that the actors' willingness to rest payment upon Sampson's ability to collect from a single purchaser suggested the absence of a broader conspiracy.   Participants in a broader conspiracy would have proceeds from other drug sales that would have allowed Sampson and Salehi

---

[19]  Even when the evidence is viewed in the light most favorable to the government, it still does not suggest that either Azzizi or Salehi would care what happened after they sold the drugs as long as they got paid.

to satisfy their respective debts from funds other than the expected payment from the distribution of this 250-grams of heroin. I realize the jury was not required to take that view of the evidence, and that we must view the evidence in the light most favorable to the government, but there must be something more than speculation to make the former scenario more likely than the latter. I can't find anything more on this record given our discussion of the relevant factors in *Pressler*.

In the final analysis, my colleagues appear to attach so much weight to the credit nature terms because they believe that, under *Gibbs*, "a credit relationship may well reflect a demonstrated level of trust." Maj. Op. at 23. However, as I have already explained, nothing in *Gibbs* brushes aside the *Wharton* rule and suggests that a credit transaction can, by itself, transform a sale and purchase into a conspiracy. The "trust" that the majority finds important to an agreement is present in any illegal drug sale. Given the substantial criminal penalties for illegal drug sales and the violence that surrounds them, a drug dealer is not likely to sell to someone he does not trust, and that is true whether the drugs are fronted, or the buyer pays cash. Similarly, absent the kind of desperation that may result from the onset of withdrawal symptoms, common sense suggests that a buyer will not purchase from a seller he does not trust.

I realize that we did say in *Gibbs* that "[a] credit relationship may well reflect the kind of trust [constituting circumstantial evidence of a conspiracy], and often evidences the parties' mutual stake in each other's transactions." 190 F.3d at 200. However, there, it was undisputed that a drug conspiracy existed. The dispositive issue was whether the defendant had joined that pre-existing conspiracy. Here, the issue is whether a

51

conspiracy even existed. We noted in *Pressler*, that where the existence of a conspiracy is at issue, much of the *Gibbs*' analysis "is simply inapposite." 256 F.3d at 146. The conspiracy is at issue here. Therefore, more is needed to transform a sale into a conspiracy than "mutual trust" between buyers and sellers. Mutual trust is a product of the illegal nature of drug sales and the attendant violence and risk. It is not, without more than appears on this record, a product of the existence of a conspiratorial relationship.

### III.

To summarize, "[A]n agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." *Iannelli v. United States*, 420 U.S. 770, 774 n.5 (citation and internal quotations omitted). That is why a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish the existence of a conspiracy. *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986).

"To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) (citation omitted). As we noted in *United States v. Pressler*, 256 F.3d 144, 146 (3d Cir. 2001), "[t]he final factor – an agreement between the defendant and some other person – is the essence of the offense, and *there is no lesser standard for proving an agreement in drug cases*." (emphasis added).

Here, the evidence only demonstrated the existence of a buyer-seller relationship

between Azzizi and Salehi, on the one hand, and Salehi and Sampson, on the other. Azzizi sold the heroin to Salehi on credit.  Then, Salehi sold the heroin to Sampson on credit.  At best, the evidence only showed that at some point after Azzizi sold the heroin to Salehi, Azzizi became aware that Sampson bought the heroin from Salehi

Accordingly, I think we must vacate the convictions for the conspiracy charged in Count One, and I must therefore respectfully dissent from the applicable analysis of my colleagues.