Ronald **PAYNE** et al., Defendants below, Appellants,

v.

The **STATE** of Delaware, Appellee.

Supreme Court of Delaware.

Submitted April 5, 1976.

Decided Nov. 16, 1976.

Roger P. Sanders of Prickett, Ward, Burt & Sanders, Wilmington, for defendant Ronald Payne.

Henry A. Wise, Asst. Public Defender, Wilmington, for defendant Carl Vincent Henry.

Francis J. Trzuskowski of Connolly, Bove & Lodge, Wilmington, for defendant Thomas LeGrande.

Alfred J. Lindh, Wilmington, for defendant Lester M. Johnson.

Ben T. Castle of Young, Conaway, Stargatt & Taylor, Wilmington, for defendant Gary Watson.

Richard R. Wier, Jr., and Charles P. Brandt, Deputy Attys. Gen., Wilmington, for State of Del.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

McNEILLY, Justice:

Defendants appeal their Superior Court jury convictions of assault with intent to commit murder (11 Del.C. § 577),[1] assault on a prison guard (11 Del.C. § 813(b)),[2]

---

1. 11 Del.C. § 577 (1953) provided:
 "Whoever, with violence, assaults another with intent to commit murder is guilty of a felony, and shall be fined not less than $500 nor more than $1,000, and imprisoned not more than 20 years."

2. 11 Del.C. § 813(b) (1966) provided:
 "(b) Whoever, with intent to do bodily harm, assaults and causes serious bodily harm to a duly constituted police officer, prison guard, or other law enforcement officer acting in the lawful performance of his

conspiracy to commit those crimes (11 Del.C. § 105),[3] and their sentences thereon. They contend that: (1) pretrial publicity prevented a fair trial; (2) their right of self-representation was violated; (3) certain evidence was erroneously admitted; (4) their wearing of prison garb, coupled with certain security measures, prevented a fair trial; and (5) presence on the jury of a juror who had a personal relationship with a prison guard prevented a fair trial.

## I

The defendants, inmates of the Delaware Correctional Center, were charged with attacking a guard of that institution and stabbing him sixteen times. At trial, the guard identified four of the defendants as his assailants, while a fifth was identified as a co-conspirator; the defendants contended that the attack was perpetrated by other inmates. The jury convicted the defendants on all counts charged. We affirm.

## II

█ The defendants' first contention is that adverse pretrial publicity deprived them of their due process right to a fair trial by an unbiased jury. They cite several cases in support of this position, including *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *United States ex rel. Clark v. Anderson,* D.Del., 356 F.Supp. 445 (1973), reversed on other grounds, 3 Cir., 502 F.2d 1080 (1974); *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

In the instant case, we find that extensive *voir dire* of the ninety prospective jurors was conducted concerning pretrial publicity, prior communications about the case, and acquaintances with defendants, attorneys, witnesses, and employees of the Correctional Center. Those who responded to having knowledge of the pretrial publicity were questioned individually in Chambers; those few who responded to additional *voir dire* were questioned individually at side-bar. In each instance the Trial Judge questioned each prospective juror for possible prejudice, exercising his discretion liberally in excusing all who appeared to have any prior involvement or knowledge. During the questioning the defendants and all counsel were present, permitted to ask pertinent questions, and participated, outside the presence of the prospective jurors, in all conferences concerning excuse for cause.[4]

We further note the presence of other factors militating against defendants' contention that they did not receive a fair trial by an unbiased jury: (1) approximately six months elapsed between the

---

duties, while in uniform, or after evidence of authority has been exhibited, or after authority has been specifically declared, shall be fined not less than $500 nor more than $5,000, and shall be imprisoned not less than 1 year nor more than 5 years."

3. 11 Del.C. § 105 (1953) provided:
 "Whoever commits or is guilty of * * * conspiracy * * * shall be fined in such amount, or imprisoned for such term, or both, as the court, in its discretion, may determine."

4. Superior Court Criminal Rule 24(a) provides:
 "(a) *Examination*. In addition to any examination required by statute, the Court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror. The Court may permit the defendant or his attorney and the Attorney General to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the Court shall permit the defendant or his attorney and the Attorney General to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

complained of publicity and trial; (2) defendants concede that no demonstrable jury bias or prejudice resulted from the pretrial publicity; (3) the Trial Judge in the exercise of extreme caution, permitted defendants thirty peremptory challenges, more than they used, and more than they were entitled to under Superior Court Criminal Rule 24(b).[5]

We find *Sheppard, Estes, Murchison* and *Pierce* to be factually inapposite. In *Sheppard* the Trial Court failed to use any effort to take precautions against influence of pretrial publicity available to prospective jurors even during *voir dire* (reversal based on totality of circumstances including trial rulings); in *Estes* the Trial Court failed to control trial publicity accessible to the jury; in *Murchison* the Trial Judge sat in contempt proceedings in which the contempt charged had been committed before him as a so-called one-man grand jury; in *Pierce* the Trial Court refused to grant a motion for change of venue after the community, in which defendant was tried, had been informed by the prosecutors and police that defendant was a confessed "triggerman" with a past record of violent crimes, and exposed to pictures of a staged re-enactment of the crimes and other widespread publicity; but in *Clark,* the Court reviewed the totality of circumstances and, as in this case, found no likelihood of jury bias from the pretrial publicity.

In the recent decision of *Nebraska Press Association v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) holding that prior restraint of pretrial publicity is impermissible under the First Amendment, Chief Justice Burger stated:

"Cases such as these (*Sheppard* and *Estes*) are relatively rare, and we have

held in other cases that trials have been fair in spite of widespread publicity. In *Stroble v. California,* 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1951), for example, the Court affirmed a conviction and death sentence challenged on the ground that pretrial news accounts, including the prosecutor's release of the defendant's recorded confession, were allegedly so inflammatory as to amount to a denial of due process. The Court disapproved of the prosecutor's conduct, but noted that the publicity had receded some six weeks before trial, that the defendant had not moved for a change of venue, and that the confession had been found voluntary and admitted in evidence at trial. The Court also noted the thorough examination of jurors on *voir dire* and the careful review of the facts by the state courts, and held that petitioner had failed to demonstrate a denial of due process. See also *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).

"Taken together, these cases demonstrate that pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial. * * *

"Most of the alternatives to prior restraint of publication in these circumstances were discussed with obvious approval in *Sheppard v. Maxwell,* 384 U.S., at 357–362, 86 S.Ct. 1519–1522: (a) change of trial venue to a place less exposed to the intense publicity that seemed imminent in Lincoln County; (b) postponement of the trial to allow public attention to subside; (c) use of searching questioning of prospective ju-

5. Superior Court Criminal Rule 24(b) provides in its pertinent part:
"In noncapital cases the State shall be entitled to 6 peremptory challenges and the defendant or defendants shall be entitled to a total of 6 peremptory challenges which shall be exercised after the jury is impanelled. The defendant or defendants shall first exercise or refuse to exercise the right of challenge. Challenges shall then proceed alternately until each side has exhausted its challenges or has expressed itself as content.
"If there is more than one defendant, the Court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."

rors, as Chief Justice Marshall did in the *Burr* case, to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court. Sequestration of jurors is, of course, always available. Although that measure insulates jurors only after they are sworn, it also enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements of the jurors' oaths." 427 U.S. at 554, 563–564, 96 S.Ct. at 2800, 2805, 49 L.Ed.2d at 694–95, 700.

And in the concurring opinion of Mr. Justice Brennan, with whom Mr. Justice Stewart and Mr. Justice Marshall concurred, it is stated:

"And, more basically, there are adequate devices for screening from jury duty those individuals who have in fact been exposed to prejudicial pretrial publicity.

" * * * In particular, the trial judge should employ the *voir dire* to probe fully into the effect of publicity. The judge should broadly explore such matters as the extent to which prospective jurors had read particular news accounts or whether they had heard about incriminating data such as an alleged confession or statements by purportedly reliable sources concerning the defendant's guilt. See, e. g., *Ham v. South Carolina,* 409 U.S. 524, 531–534, 93 S.Ct. 848, 852–854, 35 L.Ed.2d 46 (1973)

(opinion of Marshall, J.); *Swain v. Alabama,* 380 U.S. 202, 209–222, 85 S.Ct. 824, 829–836, 13 L.Ed.2d 759 (1965). Particularly in cases of extensive publicity, defense counsel should be accorded more latitude in personally asking or tendering searching questions that might root out indications of bias, both to facilitate intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. Indeed, it may sometimes be necessary to voir dire prospective jurors individually or in small groups, both to maximize the likelihood that members of the venire will respond honestly to questions concerning bias, and to avoid contaminating unbiased members of the venire when other members disclose prior knowledge of prejudicial information. * * * * "

427 U.S. at 601, 602, 96 S.Ct. at 2822, 49 L. Ed.2d at 682–83.

We find no merit to defendants' first contention.

### III

Defendants assert that they had an absolute right to represent themselves at trial (*pro se*), which was violated by the Trial Court.

During a pretrial conference, the defendants expressed their desire not to be represented by court-appointed attorneys, but did not express an intention to represent themselves without the aid of counsel.[6]

---

**6.** *The Court:*
"Mr. Payne, do you wish to add anything?
*Defendant Payne:*
"Yes, I would like to say something. This is the first time I seen this actor since June. I don't want the pig to represent me. * * * "
 &ast; &ast; &ast; &ast; &ast;
*Defendant LeGrande:*
"I would like to make a motion. I would like to charge Mr. Trzuskowski with racism like, whatever his name is, Hitler. You removed him June 27 and I would like you to remove him today."
 &ast; &ast; &ast; &ast; &ast;

*Defendant Watson:*
"I would like to say something. Do we have a right to choose counsel of our own choice?"
*The Court:*
"Mr. Watson, I don't know that I have addressed you in letter form, but I have the others and I have told them that if you are not in a position to retain or hire counsel, Court will appoint that counsel. With respect to who that counsel is that the Court appoints, no, you don't have a choice. I appoint competent counsel.
*Defendant LeGrande:*
"Are you God?"
 &ast; &ast; &ast; &ast; &ast;

After further consideration, the defendants decided to use court-appointed counsel as *"amicus curiae"* and relied extensively on counsel throughout the trial.[7]

In the recent case of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court held that denial of a literate, competent, understanding, and voluntary request for *pro se* representation made weeks before trial, violated the Sixth and Fourteenth Amendments. The factual situation presented by this case varies greatly from that of *Faretta.* In *Faretta,* the defendant was denied any participation in his trial as counsel, 422 U.S. at 810–11, 95 S.Ct. at 2529, 45 L.Ed.2d at 568, while the record before us is replete with instances of defendants' conduct of their defense and unequivocal statements from the Trial Court that their participation was permitted.[8]

---

> *Defendant LeGrande:*
> "Aren't there any more lawyers in this State?"
>
> \*　　\*　　\*　　\*　　\*
>
> *Defendant Henry:*
> "As far as the matter remaining now, he is supposed to be representing me but, like, as you can recall, several months ago I asked you to—I wanted to have a private lawyer to represent me and you refused."
>
> \*　　\*　　\*　　\*　　\*
>
> *The Court:*
> "Mr. Henry, you are not precluded from having a private attorney represent you; none of you are. Any private attorney who appears and indicates he is ready to represent you will be permitted to come into this case, and that has been true from the beginning."
>
> *Defendant Henry:*
> "Your Honor, being that this is another portion of my life being threatened, or about to be taken away from me, I think it is up to my consent who I should have represent me, but as far as it stands now, he is representing me, but if there are any further actions that we may take through court explaining our position, I am included."
>
> *The Court:*
> "Very well, Mr. Wise, the Court directs you to remain in the case and represent Mr. Henry."

7. *Defendant Johnson:*
 "My thoughts are already in the record, your Honor. I made my position clear that I do not want no severance, and counsel can act as amicus curiae and that is it."

 \*　　\*　　\*　　\*　　\*

 *The Court:*
 "He [LeGrande] has indicated to the Court very clearly that he doesn't want you to share in any part of it."
 *Mr. Trzuskowski:*
 "Is that correct, Mr. LeGrande?"

 \*　　\*　　\*　　\*　　\*

 *Defendant LeGrande:*
 "I am reconsidering that. I would use him as amicus curiae."

---

> *Defendant Payne:*
> "I will take the same position."
>
> \*　　\*　　\*　　\*　　\*
>
> *Mr. Wise:*
> "You want my help, don't you Carl?"
> *Defendant Henry:*
> "Yes."

8. *The Court:*
 "Yes, if you are going to represent yourself, then you represent yourself and the lawyer isn't involved in it. When it is time to ask questions, you ask the questions \* \* \* and when you are ruled on by the Court, you take it and sit down and someone else gets up, but you don't jump up and yell and do things of this kind or the Court will be disrupted; it is that simple."

 \*　　\*　　\*　　\*　　\*

 *The Court:*
 " \* \* \* Before we commence trial in the matter, one or more of the defendants indicated that they would prefer to handle their cases without attorneys assigned. The Court has not permitted the attorneys to withdraw from the case and has asked them to stand by and assist in whatever way they can. In the course of the jury drawing there was assistance given, as was evident, and I should like to know before the actual trial itself starts, the position of each of the defendants with respect to the attorney assigned to him. Let me say this, gentlemen \* \* \* if an individual is representing himself, it will be necessary to abide by the rules of the Court, which include responding at various times and not interrupting others and being heard the proper way \* \* \* I am not telling you you have to have an attorney, any of you, but I am asking you to give some thoughts to it. \* \* \* "

 \*　　\*　　\*　　\*　　\*

 (The defendants decided to use their attorneys.)

 \*　　\*　　\*　　\*　　\*

Defendant Johnson participated extensively in the trial, opening to the jury and cross-examining witnesses, and the other defendants also were permitted this opportunity.

■ This trial presented another dimension not present in *Faretta*—that of the disruptive defendant. On numerous occasions defendants uttered profanities and engaged in disruptive conduct. Defendants Payne and LeGrande were ejected from the courtroom several times; the Trial Court, however, made it clear that they could return whenever they would conform their conduct to acceptable standards. Standards required of members of the Bar must be adhered to by defendants undertaking their own defense, and gross deviations from those standards constitute a waiver of the right of self-representation. The Court in *Faretta* considered this issue:

> "We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. * * * Of course, a State may—even over objection by the accused —appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. * * *" 422 U.S. at 834, n. 46, 95 S.Ct. at 2541 n. 46, 45 L.Ed.2d at 581 n. 46.

*Mr. Weir:* [the Attorney General]

"I am going to make a request that if counsel asks questions on cross-examination, the defendants not ask questions. * * * I think they can make the decision whether they want to represent themselves or whether they want to be represented by counsel."

\* \* \* \* \*

We find the defendants' contention to be without merit.

### IV

Defendants' third contention is that admission into evidence of four homemade knives and the bloodstained shirt worn by the victim constituted reversible error because irrelevant (the knives) and inflammatory (the shirt).

### A.

■ The knives were found shortly after the stabbing in two rooms located near the scene of the attack. Defendants argue that the knives were not relevant because no evidence established a direct link between the defendants and the knives. This argument is without merit, because, as the jury is permitted to draw inferences from circumstantial evidence, *Howard v. State,* Del.Supr., 303 A.2d 653, 657 (1973), weighing the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inferences. *Henry v. State,* Del.Supr., 298 A.2d 327, 330 (1972). Thus, whether the knives were those used in the assault was a matter for the determination of the jury. There was no error in their admission.

### B.

■ The admission of the victim's bloodstained shirt into evidence was similarly not erroneous. The shirt was relevant to illustrate the number and size of the cuts received by the victim and to establish a nexus between the knives and the assault by permitting the jury to match the

*The Court:*
"The Court indicated earlier that this would be permitted and, unless we have undue problems, it will be permitted.
\* \* \* \* \*
*The Court:*
"The ruling, as indicated before trial commenced, was that counsel would ask questions and the defendants, if they wished to."

knives with the slits in the shirt. The record does not indicate that the shirt was used to inflame the jury, and the admission of a bloodstained shirt is not per se inflammatory. *Longoria v. State,* Del.Supr., 3 Storey 311, 168 A.2d 695, 703, cert. denied, 368 U.S. 10, 82 S.Ct. 18, 7 L.Ed.2d 18 (1961).

### V.

Defendants next content that their presumption of innocence was impaired by the cumulative effect of their appearance in prison garb and certain security measures undertaken at the trial.

 During a pretrial conference the Trial Court overruled Mr. Wise' (attorney for defendant Henry) objection to trying the defendants in prison garb;[9] however, the Trial Court subsequently inquired, before the trial, whether the defendants had any personal clothing which they wished to wear and were not permitted to wear.[10] This inquiry by the Trial Court cured any possible error that might have resulted from its earlier ruling, placing the resolution of this issue within the parameters drawn by the Supreme Court in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), where it was held that no Fourteenth Amendment violation resulted from the trial of a defendant in prison garb when no objection to the attire was made.

Furthermore, this case is distinguishable from *Williams,* as in that case the prison garb worn by the defendant was clearly identifiable as such, 425 U.S. at 503, 96 S. Ct. at 1692, 48 L.Ed.2d at 129, while the clothing worn by these defendants was not marked so as to be readily apparent as prison garb.[11]

9. *The Court:*
 "It will become evident very shortly that they are in prison and whether they are in prison garb or not, I don't think it is going to make that much difference in terms of prejudice. The objection is overruled."

10. *The Court:*
 "Do you have personal clothing that you would wish to wear and you are not permitted to, any of you?"
 *Defendant LeGrande:*
 "They won't give me my shoes."
 *The Court:*
 "Mr. LeGrande wants his shoes."
 *Defendant Henry:*
 "My stuff came in about a month or two ago and I am being deprived of it, my shoes."
 * * * * *
 *The Court:*
 "Can we check into that?"
 *Guard Ira Short:*
 "I work in the receiving room, sir."
 *The Court:*
 "Can you check on that and see what you can get for them to wear personally tomorrow and from then on?"
 *Guard Ira Short:*
 "Yes, sir."
 (No other requests were made.)

11. *The Court:*
 "Now that being determined, let me ask something that Mr. Wise raised yesterday and I have been curious about it. He was concerned about your clothing. You are not in prison garb, strictly speaking, are you? Mr. Johnson, you have a nice suit and tie and shirt and some of the others have what appear to be personal garments."
 *Defendant Payne:*
 "I think, you know, they have seen us now."
 *The Court:*
 "But I don't know what prison garb is, if what you wore yesterday is prison garb."
 *Defendant Payne:*
 "This is prison garb."
 *The Court:*
 "What you have on Mr. Henry, is prison garb?"
 *Defendant Henry:*
 "Yes."
 *The Court:*
 "How about what you have on?"
 *Defendant LeGrande:*
 "Yes."
 *Defendant Johnson:*
 "The reason why I wore prison garb yesterday, yesterday was a bath day, and from last Friday and over the weekend coming in court I didn't want to put on clean clothes, stinking, you know, so I waited till last night to take a bath."
 *The Court:*
 "Okay. Yours is a combination, I guess, Mr. Watson; you have some part of your garb that is prison garb and some isn't."

■ Additionally, the defendants here were on trial for a crime allegedly committed in prison, making their identity as prisoners a fact which they could not have concealed from the jury, while in *Williams* the defendant was not an inmate when accused. We quote from *United States ex rel. Stahl v. Henderson,* 5th Cir., 472 F.2d 556, cert. denied, 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973) ;

> "Stahl's complaint of being tried in prison garb, if indeed he was, gives us little pause. He was on trial for the murder of a fellow inmate in the Louisiana State Prison where prison garb was Stahl's normal attire. The jury necessarily knew that he was a prison inmate both at the time that he was alleged to have committed the crime and at the time of the trial. No prejudice can result from seeing that which is already known. * * *"

472 F.2d at 557.

■ The defendants' contention that the security precautions undertaken at the trial impaired their presumption of innocence is similarly without merit. The Trial Court limited the number of uniformed officers present in the courtroom to six and strived to maintain this number in the face of disruptive tactics of the defendants and spectators. A metal detector installed at the door of the courtroom was kept from the knowledge of the jurors—its efficacy was demonstrated by the refusal of certain spectators to pass through it. The security measures, of themselves, or when considered in the context of the defendants' garb, did not impair the defendants' presumption of innocence.

## VI

■ Defendants' final contention is that the presence on the jury for nine days of a juror who had a personal relationship with a prison guard constituted reversible error.

The Trial Court held an evidentiary hearing on the matter upon its being brought to the Court's attention. A witness at the hearing testified that she saw the guard and the juror recognize and wave to one another in the presence of other jurors, outside the courtroom. The guard testified that he had known the juror for seven years; that his son played with the juror's son; that he was at the Court House and active in connection with other trials during this trial; that he recognized and spoke a word of greeting to the juror on the occasion in question; that he was in uniform when the incident occurred, and that his only connection with this trial pertained to security measures outside the courtroom and escorting an inmate witness from the courtroom. The Court then denied defendants' motion for a mistrial on the grounds there was no showing of prejudice, but agreed to question the juror on the matter. The juror stated that he had in no way communicated his relationship with the guard to the other jurors and that the other jurors were unaware of the greeting that passed between them. The Trial Court, at the request of the defense, struck the juror from the panel, replacing him with an alternate.

*Defendant Watson:*
"No, all of it."
*The Court:*
"Those jerseys are prison garb, too?"
*Defendant Watson:*
"Yes."
*The Court:*
"All right. Mr. Wise, do you have further comments on that point?"
*Mr. Wise:* [attorney for defendant Henry]
"Are there any markings of any sort that are visible to indicate that they are the property of the State of Delaware?"

*Mr. Sanders:* [attorney for defendant Payne]
"Yes, the back of the pants and around the waistband."
*Mr. Wise:*
"Because if there isn't any visible marking—"
*Defendant Payne:*
"You are not allowed to have your personal clothing anyway within the institution. "Maximum security" it says on the back (indicating)."

This case differs markedly from *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), where a murder conviction was reversed because two principal prosecution witnesses, deputy sheriffs, "ate with [the jurors], conversed with them, and did errands for them." 379 U.S. at 468, 85 S.Ct. at 547, 13 L.Ed.2d at 426. The *Turner* Court contrasted that relationship with a brief encounter, the situation presented here. 379 U.S. at 473, 85 S.Ct. at 550, 13 L.Ed.2d at 429.

We agree with the Trial Court that no prejudice resulted from the juror's presence on the jury and that removal was the proper remedy upon discovery of the relationship.

Affirmed.