# SUPERIOR COURT
## OF THE
## STATE OF DELAWARE

PAUL R. WALLACE
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Date Submitted:  November 5, 2021
Date Decided:  November 10, 2021

Mr. Anthony A. Figliola, Jr., Esq.
Greto Law
715 N. Tatnall Street
Wilmington, Delaware 19801

Mr. John W. Downs, Esquire
Mr. Marc C. Petrucci, Esquire
Department of Justice
Deputy Attorneys General
820 N. French Street, 7th Floor
Wilmington, Delaware 19801

RE:  *State of Delaware v. Anthony Dale*
ID No. 1909010294
Defendant's Motion *In Limine* re: Steven Bojarski, M.D.

Dear Counsel:

This Letter Order addresses the Defendant Anthony Dale's Motion *in limine* to preclude the opinion and testimony of Steven Bojarski, M.D., who the State is offering as its expert neurologist. (D.I. 31).  Upon review of the parties' pleadings, their arguments at hearing of the motion, and the record in this case, Mr. Dale's Motion *in limine* is **DENIED.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a robbery-homicide that occurred on June 7, 2013, at the Printz Market in Wilmington.[1] During the robbery, two men were shot—one of them, Anthony Berry, fatally.[2] Soon thereafter, on June 19, 2013, Mr. Dale was arrested by the Wilmington Police Department for unrelated firearms charges.[3] When questioned, Mr. Dale told police that his cousin, Maleke Brittingham, had borrowed his firearm and implicated Mr. Brittingham in the Printz Market shooting.[4] Police subsequently searched both Mr. Brittingham's and Mr. Dale's apartments, but no evidence was found then that linked either of them to the slaying of Anthony Berry.[5] After those fruitless searches, the case went cold for about five years when, in May of 2018, police had occasion to interview Indi Islam.[6]

Ms. Islam had numerous conversations with Wilmington Police Department investigators during the summer of 2018 that ultimately led to her admitting her part

---

[1] Def.'s Mot. to Exclude Expert Op. Offered by Steven Bojarski, M.D, ¶ 2, Oct. 26, 2020 (D.I. 31).

[2] *Id.*

[3] *Id.* at ¶ 3.

[4] *Id.*

[5] *Id.*

[6] *Id.* at ¶ 5.

in the 2013 Printz Market robbery.[7]  During Ms. Islam's several interviews with investigators, she identified and described Mr. Dale's and Mr. Brittingham's involvement in the robbery-homicide.[8]  Ms. Islam was charged for her participation in the robbery, has pleaded guilty to an attempted murder count, and has agreed to testify in the trial of Messrs. Dale and Brittingham.[9]  Mr. Brittingham has also since entered into a plea agreement and is currently awaiting sentencing.[10]  That leaves Mr. Dale—whom the State alleges to be the fatal shooter—as the sole defendant to be tried in this matter.  He has been charged with two counts of first-degree murder—alleging intentional and felony murder for Mr. Berry's death—and one count of attempted first-degree.[11]

Detectives obtained a copy of the Printz Market surveillance video from the night of the robbery-homicide in an effort to identify the suspect-gunman.[12]  The

---

[7]  *Id.*

[8]  *Id.*

[9]  Plea Agreement and TIS Guilty Plea Form, *State v. Indi Islam*, ID No. 1904020331 (Del. Super. Ct.  Sept. 19, 2019) (D.I. 16).

[10]  Plea Agreement and TIS Guilty Plea Form, *State v. Maleke Brittingham*, ID No. 1909010295 (Del. Super. Ct.  June 25, 2020) (D.I. 32).

[11]  *See* Indictment, *State v. Anthony Dale*, ID. No. 1909010294 (Del. Super. Ct. Sept. 30, 2019) (D.I. 2).

[12]  Def.'s Mot. to Exclude, ¶ 6.

surveillance footage revealed some subtle, but detectible, handicapped movement or infirmity of the suspect-gunman's right arm and an obvious favored use of the left arm.[13] As part of their investigation of Mr. Dale, detectives obtained copies of his medical records from Christiana Care Health Systems. Those records included a 2011 diagnosis and treatment details for a gunshot injury to his right arm and hand.[14] X-rays of Mr. Dale's right arm displayed bullet fragments along his mid humeral shaft and a possible bone fracture.[15]

The State then consulted Dr. Steven Bojarski to review the Printz Market surveillance film, Mr. Dale's video-recorded interrogation from a wholly unrelated January 2014 incident,[16] and his 2011 medical records determine whether the symptoms and diagnosis of Mr. Dale's 2011 right arm injury is consistent with the movement and stunted lifting of the suspect gunman's right-arm and hand in the Prinz Market surveillance footage.[17] Dr. Bojarski was asked to opine as to whether

---

[13] State's Resp. to Def.'s Mot. to Exclude, ¶ 4, Nov. 23, 2020 (D.I. 32).

[14] *Id.* at ¶¶ 1-4.

[15] Def.'s Mot. to Exclude, ¶ 7.

[16] *Id.* at ¶ 8. Upon Mr. Dale's arrest for unrelated firearms charges in early 2014, he was questioned by detectives for more than four hours. *Id.* at ¶ 4.

[17] *Id.*; *see also* State's Resp., ¶ 4.

Mr. Dale had any disability to his right arm as a result of his gunshot injury, whether that disability existed still in 2014, and whether the suspect-gunman displayed signs and symptoms of the same infirmity in the 2013 surveillance video.[18] In his report, Dr. Bojarski concluded that Mr. Dale "displayed a right sided wrist drop as well as apparent right arm weakness but not total paralysis."[19] He also opined that Mr. Dale's earlier gunshot injury was consistent with a radial groove injury, and with respect to the surveillance video, the "individual behind the counter holding the gun in left hand exhibits right upper extremity weakness which could be consistent with a radial nerve injury at the radial groove."[20]

According to Mr. Dale, Dr. Bojarksi's conclusions based on a review of Mr. Dale's medical records and surveillance/interrogation films alone—as well as a lack of his own physical examination of Mr. Dale—is not a reliable medical opinion.[21]

The State argues that Dr. Bojarksi's testimony and report are sufficiently reliable, will assist the trier of fact, and are "relevant to this case as they address the

---

[18] State's Resp., Ex. A, Dr. Bojarski's Report, at pp.1-2.

[19] *Id.* at p.3.

[20] *Id.*

[21] Def.'s Mot. to Exclude, ¶ 36.

identity of the suspect."[22]   At bottom, says the State, Mr. Dale's attacks go to the

weight rather than the admissibility of Dr. Bojarski's testimony.[23]

## II. APPLICABLE LEGAL STANDARDS

Delaware Rule of Evidence 702 governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case.[24]

Delaware's Rule 702 is substantially similar to Rule 702 of the Federal Rules

of Evidence. The now well-understood bounds of the latter were interpreted and

explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[25] and *Kumho Tire Co.,*

*Ltd. v. Carmichael.*[26]  And Delaware has expressly adopted the holdings in *Daubert*

---

[22]   State's Resp., ¶¶ 16-21.

[23]   *Id.*

[24]   D.R.E. 702.

[25]   509 U.S. 579 (1993).

[26]   526 U.S. 137 (1993).

and *Kumho* to interpret our own analog rule.[27]

When its admission is challenged, a trial judge must ensure that expert testimony is both relevant and reliable.[28] Consistent with *Daubert*, Delaware requires the gatekeeping judge to engage a five-step analysis to determine the admissibility of a proffered expert's testimony.[29] To properly determine admissibility, the judge must ensure that:

(1) the witness is qualified as an expert by knowledge, skill experience, training or education;

(2) the evidence is relevant;

(3) the expert's opinion is based on information reasonably relied upon by experts in the particular field;

(4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and

(5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[30]

---

[27] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999)).

[28] *Daubert*, 509 U.S. at 597.

[29] *Bowen*, 906 A.2d at 795.

[30] *Id*.

The party seeking to introduce the expert testimony must shoulder the by-a-preponderance-of-the-evidence burden of establishing its admissibility.[31] And "[a] strong preference exists" for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[32]

### III. DISCUSSION

Though Mr. Dale concedes that Dr. Bojarski is qualified in the field of neurology, he insists the doctor's opinions here are not the product of a scientific process backed by sufficient facts or data.[33] Mr. Dale suggests four grounds to exclude Dr. Bojarksi's expert opinions: (1) Dr. Bojarksi hasn't conducted a hands-on physical examination of Mr. Dale to discern the current extent and nature of his right-arm injury and symptoms; (2) Dr. Bojarski's observation of Mr. Dale's 2014 four-hour interrogation recording is inadequate for evaluating any signs and symptoms of a radial nerve injury; (3) Dr. Bojarski's conclusion that the suspect in the surveillance footage displays like symptoms of the same radial nerve injury Mr. Dale's suffered is speculative and devoid of any diagnostic techniques for assessing

---

[31] *Id.*

[32] *Delaware ex. rel. French v. Card Compliant, LLC*, 2018 WL 4151288, *2 (Del. Super. Ct. Aug. 29, 2018) (quoting *Norman v. All About Women, P.A.*, 193 A.3d 726, 730 (Del. 2018)).

[33] *See generally* Def.'s Mot. to Exclude.

the suspect's perceived medical condition; and (4) the probative value of Mr. Dale's radial nerve injury is substantially outweighed by the danger of unfair prejudice because the introduction of his prior gunshot injury and the extensive police interrogation constitute inadmissible character evidence.[34] Mr. Dale also argues, in the alternative, that the Court must conduct some further *Daubert* hearing in the event this Court cannot make a determination on the motions and current record alone.[35]

## A. DR. BOJARSKI'S EXPERT OPINIONS ARE (1) RELEVANT, (2) WILL ASSIST THE FACT FINDER, AND (3) WILL NOT OCCASION UNFAIR PREJUDICE.

Without question, Dr. Bojarski is a qualified medical expert witness by knowledge, skill, experience, training, and education.[36] So the Court need not address that part of the *Bowen/Daubert* inquiry any further.

With respect to the remaining factors, Dr. Bojarski's expert opinions no doubt are relevant, will assist the fact finder, and are based on information reasonably relied upon by those practicing neurology.[37] And regarding the fifth and final aspect

---

[34] Def.'s Mot. to Exclude, pp.7, 10, 13, and 17.

[35] *Id.* at ¶ 38.

[36] Tr. of Mot. Hr'g., Oct. 18, 2021, 17-18 (Mr. Dale's counsel concedes that he "can't question [Dr. Bojarski's] credentials.") (D.I. 49).

[37] *Bowen*, 906 A.2d at 795.

of the *Bowen/Daubert* inquiry, any prejudice that may result from Dr. Bojarski's testimony can be avoided by redactions and limiting instructions to the jury.[38]

Expert testimony is relevant if it assists the fact finder in "understand[ing] the evidence or . . . determin[ing] a fact in issue."[39] And evidence from an expert creates a danger of unfair prejudice when it suggests a decision on an improper basis, commonly, emotion rather than reason.[40]

Here, *the* central issue is whether Mr. Dale is the suspected gunman seen in the Printz Market surveillance video.[41] When viewed carefully, the subject in the surveillance footage presents with hampered movement on his right side.[42] The abnormal movement and position of the suspect's hand and arm bears remarkable resemblance to symptoms caused by Mr. Dale's previous gunshot injury to his right upper extremity.[43] To aid in this determination, Dr. Bojarski's testimony is relevant

---

[38] *See, e.g., U.S. v. Salehi*, 187 Fed.Appx. 157, 166-167 (3d Cir. 2006) (noting that redactions in proper form and appropriate limiting instructions "can cure the constitutional problem that arises" from introduction of potentially prejudicial evidence that might pose a confrontation right issue).

[39] *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702).

[40] *Henlopen Hotel, Inc. v. United Nat'l Ins. Co.*, 2020 WL 233333, at *12 (Del. Super. Ct. Jan. 10, 2020).

[41] *See* State's Resp. at ¶ 16.

[42] *Id.* at ¶¶ 4-5.

[43] *Id.* at ¶ 5.

because it will assist the fact finder in understanding the lingering side effects or range of motion limitations resulting from the type of injury Mr. Dale endured. And, though Mr. Dale suggests Dr. Bojarski's testimony concerning the prior gunshot injury and his four-hour long police interrogation will create unfair prejudice, the Court may remedy these concerns with curative instructions and redactions.[44] Surely, it would be difficult—if not more prejudicial to Mr. Dale—to point out the presence of bullet fragments in his arm without explaining the innocent and unfortunate way they reportedly got there, *i.e.*, Mr. Dale's treatment records reviewed by Dr. Bojarski note he was at home and in "his usual state of health" when he "heard a gunshot and felt a pain in his right arm."[45]

The jury may credit Dr. Bojarski's opinions and analysis, or may not, but there is nothing in the record to suggest his testimony will appeal to or persuade the jury on any improper basis. Whatever persuasive power might lie in his opinions derives from the coherence and power of his testimony's content to explain Mr. Dale's injury, its resulting limitations, and that the suspect's movements observed in the surveillance video are consistent with the symptoms caused by that type of injury.

---

[44] *See Henlopen Hotel*, 2020 WL 233333, at *5 (Observing that Rule 702 "[e]vidence appeals to an unfair prejudice when it tends to suggest decision on an improper basis, commonly but not necessarily emotion rather than reason.").

[45] State's Resp., Ex. A, Dr. Bojarksi's Report at p.1.

### B. DR. BOJARSKI'S OPINIONS AND CONCLUSIONS ARE RELIABLE; THEY ARE BASED ON A REASONABLE MEDICAL PROBABILITY AND ARE SUPPORTED BY THE FACTS AND EVIDENCE IN THIS CASE.

Dr. Bojarski's opinions and conclusions that the suspect's movements observed on the surveillance video are consistent with the symptoms and limitations expected of one who suffered the same radial nerve injury endured by Mr. Dale are reliable. And the State has demonstrated that Dr. Bojarski is aware of the fundamental facts present here and provides a factual basis for his opinion. Reliable expert testimony is premised on specialized knowledge, which requires the testimony to be grounded in appropriate methods and procedures and "supported by appropriate validation—i.e., 'good grounds,' based on what is known."[46]

Many scientific, technical, or specialized fields are not subject to peer review and publication—that's why the test of reliability is "flexible" and rigid application of each *Daubert* factor cannot be engaged to determine testimonial reliability in every field of expertise.[47] Even with all the advances of medical science, the practice of medicine remains an art, and a diagnosis in the practice of clinical medicine "is

---

[46] *Daubert*, 509 U.S. at 590.

[47] *Henlopen Hotel*, 2020 WL 233333, at *1, *3.

not an exact science." [48]

In clinical medicine, standard practice of diagnosing a patient and establishing cause is through differential diagnosis.[49]  Differential diagnosis refers to the process of determining which affliction the patient is suffering from by means of comparing various competing diagnostic hypotheses with the clinical observations and findings.[50]  And the process of differential diagnosis is one tool Dr. Bojarski engages here in deriving his opinion in what is, to be sure, an unusual setting for a physician. But—regarding the review of Mr. Dale's prior medical records and observing his movements in the police interview—it is not uncommon for a physician to reach a reliable diagnosis without himself performing a first-person physical examination.

---

[48]  *State v. McMullen*, 900 A.2d 105, 114 (Del. Super. Ct. 2006).  *See Moore v. Ashland Chem.*, 126 F.3d 679, 688-690 (5th Cir. 1997), *vacated on reh'g en banc*, 151 F.3d 269 (5th Cir. 1998) ("First, the goals of the disciplines of clinical medicine and hard Newtonian science are different. . . . Second, the subject matter and conditions of study are different. . . . Finally, clinical medicine and hard science have marked different methodologies. . . . In sum, hard Newtonian scientific knowledge . . . is knowledge of a particular and limited kind. . . . Although clinical medicine utilizes parts of some hard sciences, clinical medicine and many of its subsidiary fields are not hard sciences. . . . Consequently, the *Daubert* factors, which are hard scientific methods selected from the body of hard scientific knowledge and methodology generally are not appropriate for use in assessing the relevance and reliability of clinical medical testimony.").  The Fifth Circuit's discussion of the significant differences between disciplines in "hard science" and clinical medicine still holds true even though the decision in that case was ultimately vacated. *Id.*

[49]  *McMullen,* at 116; *see also Bowen v. E.I. duPont de Nemours and Co., Inc.,* 2005 WL 1952859, at *11 (Del. Super. Ct. May 9, 2005) (noting differential diagnosis is a standard practice for establishing cause in clinical medicine).

[50]  *McMullen,* at 116.

Indeed, consulting physicians regularly arrive at diagnoses by relying on examinations and tests performed by other medical practitioners.[51] On that score, Dr. Bojarksi testified that while neurologists do spend a significant amount of time on their patient examinations, half of the exam is based on observation alone.[52]

A gatekeeping judge has "broad latitude" to determine whether an expert's proffered opinion is based upon the "proper factual foundation and sound methodology."[53] This "proper factual foundation" language has been distilled from [Delaware Rule] 702."[54] To meet the criterion for a "proper factual foundation" an expert's opinion must be based on "facts" and not "suppositions."[55] When applied to a medical expert, a causation opinion is admissible when it's "based on his analysis of the circumstances . . . not mere speculation over the cause."[56] And a proponent need to show only by a preponderance of the evidence that its expert's

---

[51]  *Id.* at 117; *State v. Salasky,* 2013 WL 5487363, at *26 (Del. Super. Ct. Sept. 26, 2013).

[52]  Tr. of Mot. Hr'g., 50:16-20. "There's a thing called semiotic medicine . . . [i]t's observation for the most likely diagnoses. . . . And as time goes on, you're going to learn . . . almost half of your exam [is done before you enter the exam room.]" *Id.* at 54:23-55:12.

[53]  *Russum v. IPM Dev. P'ship LLC*, 2015 WL 2438599, at *2 (Del. Super. Ct. May 21, 2015).

[54]  *Id.* at *2.

[55]  *Id.* at *3.

[56]  *Norman*, 193 A.3d at 730.

opinions are reliable not that they are correct.[57] So, this Court's Rule 702 reliability examination must focus on principles and methodology and not on the resultant conclusions.[58]

Delaware courts generally recognize that challenges to the "factual basis of an expert opinion go[ ] to the credibility of the testimony, not the admissibility, and it is for the opposing party to challenge . . . the expert opinion on cross-examination."[59] "The different depth with which [an expert] pursued particular lines of investigation and the different assumptions they made are readily subject to cross-examination and to evaluation by the fact finder for credibility and weight."[60] But an expert's testimony will only be excluded in the narrow circumstance that the

---

[57] *State v. McMullen*, 900 A.2d 105, 114 (Del. Super. 2006) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir. 1994)).

[58] *Henlopen Hotel*, 2020 WL 233333, at \*2 ("At bottom, the Court's examination of an expert's opinion must be solely focused on principles and methodology, not on the conclusions they generate.") (cleaned up) (quoting *Tumlinson v. Advanced Micro Devices*, 81 A.3d 1264, 1269 (Del. 2013)).

[59] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010); *Hodel v. Ikeda*, 2013 WL 226937, at \*4 (Del. Super. Ct. Jan. 18, 2013). *See also Daubert*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)).

[60] *Henlopen Hotel*, 2020 WL 233333, at \*4; *Perry*, 996 A.2d at 1271 (noting cross-examination rather than exclusion can be the proper method of exploring the bases of an expert's opinion and the weight to be ascribed thereto).

expert has completely neglected the core facts of the case.[61] And under Delaware Rule 702, a medical doctor's opinion "based on his own knowledge" formed by his review of a patient's records may certainly be sufficient to clear the *Daubert/Bowen* reliability threshold.[62] To be sure, the thorough review of treatment records Dr. Bojarski engaged is a common and generally accepted method used by medical experts to divine causation of a given condition. In other words, Dr. Bojarski did not stray from commonly used and accepted principles, *i.e.*, review of medical records (here supplemented by examination of video footage), to reach his conclusion that the gunman's movements and limitations demonstrated in the Printz Market surveillance video were consistent with that expected from one suffering from a radial nerve injury. That said, it's important to note that Dr. Bojarksi is *not* identifying Mr. Dale in the Printz Market footage; rather, his testimony's sole focus is to identify the arm weakness manifest in the suspect shooter's right arm and its correlation to symptoms and limitations that are consistent with the injury Mr. Dale endured in 2011 that were present still in the 2014 interview video.

---

[61] *Smack-Dixon v. Wal-Mart, Inc.,* 2021 WL 3012056, at *6 (Del. Super. Ct. July 16, 2021).

[62] *E.g.*, *Norman*, 193 A.3d at 731-32.

**1. Dr. Bojarski's failure to conduct a hands-on physical examination of Mr. Dale doesn't render his opinion unreliable.**

Mr. Dale insists that Dr. Bojarksi's failure to conduct a physical examination to discern the extent and nature of his right arm injury does not comport with any standard diagnostic techniques, and thus, he could not properly formulate an opinion about Mr. Dale's radial nerve injury.[63] In Mr. Dale's view, Dr. Bojarksi's review of his medical records and the doctor's conclusion that followed failed "to bridge the 'analytical gap between the data and the opinion offered.'"[64] So, says Mr. Dale, Dr. Bojarski's testimony is inadmissible due to a lack of any established methodology supporting his conclusion.[65]

Surely, the circumstances here present a unique use of a medical expert witness. But a medical doctor's diagnostic opinion formed after his own independent review of a patient's medical records is common stuff both in everyday medicine and under *Daubert/Bowen* examination.[66] And nothing Dr. Bojarski did here offends the *Daubert/Bowen* requirement of application of this reliable

---

[63] Def.'s Mot. to Exclude, ¶¶ 16-22.

[64] Def.'s Mot. to Exclude, ¶¶ 16-17 (quoting *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010)).

[65] *Id.* at ¶ 22.

[66] *E.g.*, *Norman*, 193 A.3d at 731-32.

methodology in this anomalous setting.  Dr. Bojarski reviewed Mr. Dale's prior

hospital admission and treatment records as well as video footage of Mr. Dale from

a post-injury police interrogation to assess the nature and extent of his resultant

symptomology.  And Dr. Bojarski studied the Printz Market surveillance video to

determine whether the subject's movements corresponded with the type of arm

injury Mr. Dale suffered.  In short, this first point of contention attacks the factual

sufficiency and bases of Dr. Bojarski's opinion—such challenge may warrant

vigorous cross-examination or admission of contrary evidence but not exclusion.[67]

## 2. Dr. Bojarski's observation of and conclusions taken from the recording of Mr. Dale's 2014 police interview is consistent with standard neurology clinical techniques.

Mr. Dale next contends that Dr. Bojarski's study of Mr. Dale's four-hour

police interview is an inadequate means of evaluating and concluding whether he

exhibited the signs and symptoms of a radial nerve injury.[68]  But "a physician need

not conduct every possible test to rule out all possible causes of a patient's illness,

---

[67]  *Perry*, 996 A.2d at 1271; *Hodel*, 2013 WL 226937, at \*4. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)).

[68]  Def.'s Mot. to Exclude, ¶ 23.

'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.'"[69]

As Dr. Bojarski explained, a common diagnostic technique among neurologists is simple observation of their patients: "One of the things with neurologists, we spend a lot of time with our examinations. Half of the exam, believe it or not, is based on observation. When we diagnose strokes, for example, it's on observation primarily. Then we go about proving it."[70] And, when recounting his review of Mr. Dale's records and the assailant depicted in the Printz Market surveillance video, Dr. Bojarski affirmed that observations of both subjects revealed an apparent injury to the right arm.[71]

He further testified about his use of semiotic medicine ("the observation for the most likely diagnoses") and how the powers of observation allow a neurologist to "pick up a lot of subtleties" that direct his testing and what he's "going to be looking for."[72] Thus, even though Dr. Bojarski's observation of Mr. Dale, *vis-à-vis*

---

[69]  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 761 (3d Cir. 1994)).

[70]  Tr. of Mot. Hr'g., 50:17-22.

[71]  Tr. of Mot. Hr'g., 53:18-20. ("That's right. It's a wrist drop, which is classic radial nerve injury. It doesn't tell you where it is though, along the line.").

[72]  *Id.* at 55:15-17.

the interview video, and of the suspect shooter in the surveillance film, may be somewhat unconventional and indirect, his methodology isn't really that extraordinary; it's merely an atypical engagement of a commonly accepted neurology practice of carefully observing a patient in unguided action to discern the most likely diagnosis of any noted affliction.

> **3. Dr. Bojarski's testimony that the assailant in the Printz Market surveillance footage displays symptomatology of one suffering the effects of a radial nerve injury is adequately supported, reliable and admissible.**

Mr. Dale posits that Dr. Bojarski's conclusion that the suspect in the Printz Market surveillance recording displays similar symptoms of his same radial nerve injury is speculative and derived from diagnostic techniques inadequate to assess the suspect's perceived medical condition.[73] Dr. Bojarski is proferred to opine whether "the person behind the counter, that is armed with a handgun and is wearing a dark colored hooded sweatshirt displays the same type of disability" that's noted in Mr. Dale's 2011 medical records.[74] For the reasons already discussed, Dr. Bojarski's observation of the suspect shooter's movements in the surveillance video and his subsequent opinion that the limited range of motion observed could be attributed to

---

[73]  Def.'s Mot. to Exclude, ¶ 28.

[74]  Def.'s Suppl., Ex. A1, State's Letter Req. to Dr. Bojarksi, Nov. 4, 2021 (D.I. 50).

a radial groove injury—like the one Mr. Dale was treated for—does not offend commonly accepted diagnostic standards in the field of neurology. Accordingly, his testimony is not excludable on this basis.

**4. The probative value of evidence of Mr. Dale's radial nerve injury is not substantially outweighed by any danger of unfair prejudice.**

When a court finds expert testimony admissible under Rules 702 and 703, a party might raise an objection to the admissibility of potentially prejudicial evidence or testimony using Rule 403 as an independent means of exclusion.[75] Under Delaware Rule of Evidence 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[76] "The determination of unfair prejudice is a matter within the bounds of discretion of the trial court."[77] And, to justify exclusion of potentially prejudicial evidence prior to trial, "the court must have before it 'a record complete enough on the point at issue to be considered

---

[75] *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 274 (3d Cir. 1991).

[76] D.R.E. 403.

[77] *N. Am. Philips Corp. v. Aetna Cas. & Sur. Co.*, 1995 WL 628447, at *4 (Del. Super. Ct. Apr. 22, 1995).

a virtual surrogate for a trial record.'"[78]

Mr. Dale complains the prejudicial value of Dr. Bojarski's testimony substantially outweighs the probative value because his reliance on Mr. Dale's four-hour long 2014 police interview inevitably introduces impermissible character evidence suggestive of prior bad acts.[79] He suggests that while the jury may have sympathy for his gun shot injury, they will be unable to compartmentalize the "prior bad acts" aspect of his 2014 police interview.[80] Says Mr. Dale, presentation of the 2014 police interview is impermissibly prejudicial because he is present in a police interrogation room, with armed police officers, being questioned on an unrelated gun charge.[81] And according to Mr. Dale no amount of sanitization, muting, or paring down of the police interview footage can sufficiently remove the undue unacceptable prejudice he will suffer.

In his view, too, the jury will not be able to "infer anything other than [Dr.] Bojarski, an expert, is identifying [Mr.] Dale" as the shooter in the video.[82] This is

---

[78]   *Id.*

[79]   Def.'s Suppl., p.2; *see also* Def.'s Mot. to Exclude, ¶ 37.

[80]   *Id.*

[81]   Def.'s Suppl., p.2.

[82]   *Id.* at 3.

so because his testimony, put simply, is that the "shooter has a bad hand," and before coming to that conclusion, he reviewed Mr. Dale's hospital records and police interview which indicated he, too, had a bad hand.[83]

The State has produced a pared down version of the police interview video to a 25-minute, muted clip that focuses on Mr. Dale's arm positions and movements.[84] The Court is satisfied that this now-sanitized version of Mr. Dale's 2014 police interview cures any unnecessarily prejudicial undertones present in the uncut version Dr. Bojarski used in his analysis.

As previously discussed, the identity of the Mr. Berry's shooter is ***the*** key issue in this case. So the probative value of any evidence—even circumstantial evidence—is at premium here.[85] Without Dr. Bojarski's testimony, no evidence would be presented that Mr. Dale suffered a previous radial nerve injury that—at the time of the Printz Market killing—would have limited his range of motion, weakened that right extremity, and burdened him with certain classic observable

---

[83]   *Id*. at 3.

[84]   State's Suppl., Ex. 1, Redacted/Muted NCCPD Interview of Mr. Dale, Nov. 5, 2021 (D.I. 52).

[85]   *Ciccaglione v. State*, 474 A.2d 126 (Del. 1984) (citing *Payne v. State*, 367 A.2d 1010 (Del. 1976) ("a jury is permitted to draw inferences from circumstantial evidence as from any other evidence submitted.")).

hand and wrist infirmities. Mr. Dale's prior right arm injury and its potential to assist in identifying the otherwise unrecognizable hooded shooter is properly admissible circumstantial evidence for the jury to weigh in its factfinding. To the extent there is any lingering concern of undue prejudice attendant to the presentation of this evidence, the Court will—in addition to ordering careful redaction of the related materials presented—work with the parties to craft and deliver an appropriate limiting instruction. But again, a proferred expert's testimony can't be excluded just because an opponent quarrels with his conclusions.[86] Accordingly, Dr. Bojarski's testimony, along with the redacted evidence, is admissible.

## IV. CONCLUSION

Dr. Bojarski's testimony is admissible because it is relevant, reliable, and will aid the fact finder in determining whether Mr. Dale is the gunman seen in the Printz Market surveillance video. The identity of the assailant in that footage might properly be divined, in part, from the factfinders' understanding of his or her unique right arm movements and presentation. And with the safeguards mentioned, the

---

[86] *See Daubert*, 509 U.S. at 595 (To pass on the "evidentiary relevance and reliability" of a given expert's opinion "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 733 (Proponents "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable.") (emphasis in original).

probative value of this State's evidence actually and substantially outweighs any perceived danger of unfair prejudice.[87]

Accordingly, Mr. Dale's motion *in limine* to preclude the expert testimony and report of Dr. Steven Bojarski is **DENIED.**

**IT IS SO ORDERED.**

_____

Paul R. Wallace, Judge

Original to Prothonotary

---

[87] *See* D.R.E. 403 (to exclude relevant evidence a Court must find that its probative value is substantially outweighed by a danger of, among other things, unfair prejudice). Even where evidence might be said to implicate "prior bad acts"—which the Court finds this carefully circumscribed presentation would not—the Court "needs to 'balance the probative value of such evidence against its' potential for prejudice (*i.e.,* a D.R.E. 403 analysis)" in the same way. *See Trump v. State,* 753 A.2d 963, 971 (Del. 2000) (quoting *Getz v. State,* 538 A.2d 726, 734 (Del. 1988) and providing a detailed explanation of the trial judge's role when engaging the Rule 404(b) and Rule 403 analyses).